No. 38,742

STATE OF KANSAS, *Appellant*, v. PETE LARKIN, CLARA LARKIN, THE MERCHANTS CLUB, a corporation, KENNETH GRIGSBY, JOHN W. LITTLE, TED A. MENDENHALL, JOHN WEST and H. I. MELLENBRUCH, *Appellees*.

(243 P. 2d 686)

Opinion filed May 10, 1952.

*Harold R. Fatzer*, attorney general, and *Harold H. Harding*, county attorney, argued the cause, and *C. H. Hobart*, assistant attorney general, and *J. Milton*

*Sullivant* and *Francis J. Donnelly,* assistant county attorneys, were with them on the briefs for the appellant.

*Joseph H. McDowell,* of Kansas City, argued the cause, and *Stanley L. Lind,* also of Kansas City, was with him on the briefs for the appellees.

The opinion of the court was delivered by

WERTZ, J.: This was an action to abate a liquor nuisance and for a permanent injunction. Judgment was rendered for defendants and the state appeals.

The action was commenced by the state of Kansas on relation of the county attorney of Wyandotte county, hereinafter referred to as plaintiff, against Pete Larkin, Clara Larkin, The Merchants Club, Kenneth Grigsby, John W. Little, Ted A. Mendenhall, John West and H. I. Mellenbruch, hereinafter referred to as defendants. Plaintiff filed a verified petition alleging that defendants were unlawfully keeping and maintaining a place where alcoholic liquors were sold, bartered and given away in violation of the Alcoholic Beverage Control Laws of the State of Kansas (ch. 242, Laws 1949; G. S. 1949, ch. 41), and a place where persons were permitted to resort for the purpose of drinking alcoholic beverages in violation of that Act, and praying for a permanent injunction and the issuance of a writ of abatement against said premises. Upon proper motion, a temporary injunction was granted pending a hearing of the case on its merits.

Defendants' answer was a general denial. The cause was advanced on the docket and was tried by a judge pro tem on the pleadings and agreed statement of facts. The court found generally in favor of defendants and against plaintiff, dissolved the temporary injunction, and denied the relief sought by plaintiff. From the judgment of the lower court, plaintiff appeals and asserts five specifications of error which may be summarized as follows: The court erred in ruling (1) that defendants were neither offering for sale nor selling alcoholic liquor by the drink or in quantities of less than one-half pint; (2) that defendants were not directly or indirectly maintaining an open saloon on the premises; (3) that the premises were not a public place as defined by law; (4) that the use and occupancy of the premises did not constitute a violation of law and was not a common nuisance; and (5) the court erred in dissolving the temporary injunction previously granted and in refusing to grant a permanent injunction.

Pertinent portions of the agreed statement of facts may be related as follows: The premises in question were at all times involved herein owned by defendants Larkin; from 1945 to November 28, 1951, the Larkins operated a beer tavern on the premises involved in this action; on the latter date they surrendered to the proper authorities their cereal malt beverage license for cancellation. For some time prior to November 15, 1951, defendants Little, Grigsby, West, Mendenhall and Mellenbruch discussed among themselves and with defendants Larkin the advisability of organizing a club for the social and recreational welfare of its members, which club would authorize and permit the members of the club to keep, use and drink alcoholic liquors in a clubroom to be maintained and operated by such organization. The five defendants proposed to defendant Pete Larkin that the first floor and basement of his building be leased to such proposed club and that he be employed as manager of the club on a weekly salary. Defendant Pete Larkin after considering such proposal stated that the beer business had not been good and he was willing to accept the offer of the five defendants. Thereupon each of the five defendants agreed to loan the club $100 to be paid to defendant Grigsby and used as advance capital in order to get the club in operation, the money being advanced with the understanding it would be repaid by the club when it was financially able. On November 16, 1951, articles of incorporation were issued by the secretary of state to The Merchants Club, a corporation organized not for profit. The incorporators held their first meeting November 19, 1951, and elected a board of directors composed of the five defendants and officers consisting of the same defendants with the exception of defendant Mellenbruch. The $500 capital as related, was deposited in the club bank account and a written one-year lease was entered into between the club and the Larkins at an agreed monthly rental of $375. It was further agreed that defendant Pete Larkin would be employed as manager to operate the club at a salary of $100 per week. Discussion was had at a meeting of the board as to methods and means whereby alcoholic liquors could be purchased by the club and kept on the premises operated by the club and made available for use of its members by the drink. It was decided that an alcoholic beverage committee would be created from the membership of the club for the purpose of making liquors available to members of the club on the premises involved. The following rule was adopted:

"The House Committee, appointed by the President and approved by the Board of Directors, have published the following rule concerning alcoholic beverages, and same has been approved by the Board of Directors.

"RULE
"ALCOHOLIC BEVERAGE COMMITTEE

"The House Committee shall constitute the Alcoholic Beverage Committee of the club and any member of the club in good standing may secure the services of the committee, at no cost, to purchase for such member a quantity of liquor and beer as follows:

"Any member desiring same may contribute to a fund for such purpose, and unit books ($2.00 and $5.00) will be issued to such member to identify his interest in the fund. The proceeds shall be used to purchase a supply of beer and liquor for such member's personal use.

"Such liquor and beer shall be the joint property of those members who have contributed to the fund in proportion to their contributions as evidenced by unit books.

"Withdrawals may be made from the supply of liquor by the members owning interests in same upon presenting to the club manager coupons from said unit books evidencing such member's interest. The units shall for the time being be designated as follows:

"50 units shall constitute ownership of one ounce of hard liquor, and 25 units shall constitute ownership of one bottle of beer.

"Each six months, beginning on May 23, 1952, an inventory of the supply shall be taken and the proportionate interests of each member shall be determined at that time and notice of same given to such members.

"No liquor or beer shall be sold, bartered or given away at any time."

The board of directors also adopted certain bylaws governing the operation of the club. They are short and consist of three sections: Sec. 1 provides in substance that no person shall be eligible as a member unless he is of legal age, of respectable standing in society, and of good moral character; section 2 makes provision that wives of members shall be entitled to use the facilities of the club; section 3 provides that each proposal for membership shall state the name of the proposed member, his residence, address and business connection, shall be signed by the proposer and two seconders, and if approved by the committee and the board of directors, his name will be posted for ten days and if any member of the club objects in writing to the person proposed, the proposed member's name shall be referred back to the board of directors for reconsideration and for such further action as may be deemed necessary. The foregoing is the extent of the bylaws of this corporation.

This club maintained its clubroom from November 24, 1951, to January 26, 1952. It was not open to the general public; an elec-

tronic device was attached to the front door of the clubroom whereby the door could be opened only by inserting a membership card in the lock device. Pete Larkin managed the club and was on duty at all times to attend the members of the club who desired to drink liquor in the clubroom maintained by the club. No merchandise other than alcoholic liquors, strong beer, soft drinks, potato chips, popcorn and pretzels was served in the clubroom to any of its members. During the mentioned time one social function, namely a square dance, was sponsored. On January 26 there were approximately 143 members of the club. The membership fee was $1.50 and the annual dues $1. During the time the club was in operation a total of $335 was collected as membership fees and dues. During the same period of time, defendant Pete Larkin was paid the sum of $100, other employees of said club, including bartenders and book-keepers, were paid the total sum of $1,042. No rent was paid to defendant Larkin as provided by said lease agreement. During said time, coupon books in denominations of $5 and $2 values respectively of a total value of $3,582 were purchased by members of the club. The total value of beer and other alcoholic liquors purchased by the club during the mentioned period of time amounted to $2,306.23; on January 26 the inventory of liquors and other merchandise was $226.20 and there was $525.20 in cash on hand.

The following method or plan was adopted and used by the club in purchasing and dispensing liquor to its members:

"(a) On November 23, 1951, the sum of $200.00 was deposited in a special account in the Home State Bank under the caption, 'House Committee Account' for the purpose of purchasing alcoholic liquors to be dispensed by the drink to the members of the club. Any two of the four officers of said club were authorized to sign checks drawn on this account; that after the club was in operation, it became the customary practice of the defendant, Pete Larkin, manager of the club, to purchase alcoholic liquors, including beer, from retail liquor stores in Kansas City, Kansas as needed; that such alcoholic liquors so purchased were bought by defendant, Pete Larkin, at various retail liquor stores in Kansas City, Kansas and the major portion of such purchases were paid for by cash and some by check, all from the sale of coupon books to club members and from the sum of $200.00 initially deposited in the House Committee account at the Home State Bank as aforesaid.

"(b) Coupon books containing 500 and 200 units respectively, representing the value of $5.00 and $2.00, were printed and supplied to the manager of the club, Pete Larkin, and were delivered to members of said club by the said Pete Larkin upon the payment by them of $5.00 or $2.00, depending on which of the two coupon books was desired by a member. That one such coupon book, marked Exhibit (4) is attached hereto and made a part hereof.

"(c) That a club member, after receiving or obtaining either one of said coupon books upon the payment by cash or check of the monetary value of either of said coupon books, was then authorized or permitted to be served, receive, withdraw or obtain alcoholic liquors and strong beer from a bartender employed by said club upon the surrender or giving to said employee units from said coupon books which were printed or marked in amounts or denominations of 5 units, 10 units and 25 units, respectively. As a specific example of this transaction, a club member would be served a bottle or can of strong beer by an employee of the club upon the surrender or giving to said employee of 25 units, of the value of 25¢, from either of said coupon books, and a club member would be served a one-ounce glass of whiskey, either bourbon or scotch or a comparable amount of gin or wine liquors, upon the surrender or giving to an employee of said club 50 units, of the value of 50¢, from either of said coupon books that said units as surrendered or given by a club member to the bartender or employee of said club were placed in a cash register kept on the bar of said club, and the numerical amount of each unit was rung up on the cash register and registered on the tape attached to the machine, whereby the manager of said club, Pete Larkin, and the officers were able to keep a daily record of the total amount of unit denominations of alcoholic liquors, including strong beer, which was served or dispensed to the members of said club and their guests. That it was the customary practice of members of said club to purchase the said coupon books, Exhibit (4), singly, and the stock or supply of said coupon books was kept on the premises of the club at 905 North 6th Street and in the custody and under the control of the manager of the club, Pete Larkin, who, in turn, accounted to the officers of the club for the number of coupon books delivered or transferred to the members of said club, and the money received by him, the said Pete Larkin, from the transfer or delivery of said coupon books as aforesaid. That all glasses, ice and service used or incident to the serving or withdrawing of alcoholic liquors, including strong beer, to the members of said club in quantities of less than one-half pint and by the drink were owned, controlled and furnished by the said Merchants Club on the premises of the clubroom at 905 North 6th Street, Kansas City, Kansas. That continuously from the said 24th day of November, 1951, to on or about the 26th day of January, 1952, alcoholic liquors, including strong beer, were served, delivered to and consumed by members of said club in quantities of less than one-half pint and by the drink as hereinbefore stated and described.

"(d) That it was the customary practice and procedure of the defendant, Pete Larkin, manager of said Merchants Club, to purchase all of the alcoholic liquors, including strong beer, for said club from licensed retail stores in quantities varying from 6 to 12 fifths of whiskey and from one to two cases of strong beer at each interval of purchase, and to pay cash for the same, said cash being derived from the sale of coupon books to the members of said club; that after said alcoholic liquors were so purchased by the said Pete Larkin, they were stored and kept by him on the premises of the club to be served and dispensed to members of the club and their guests as aforesaid.

"(e) That the average cost of whisky, including scotch and bourbon, purchased by the said Pete Larkin for the Merchants Club was $5.50 to $6.00

per fifth; that 24 or 25 one-ounce servings are obtained from each one-fifth of whiskey. That the average cost of a case of 24 cans or bottles of strong beer purchased by the said Pete Larkin for the Merchants Club was $4.40. That the difference or excess between the cost of a fifth of alcoholic liquor purchased by the club manager and thereafter served, dispensed or withdrawn to or by the members of said club as aforesaid is approximately 600 units, of the bookkeeping value of $6.00; that the excess or difference between the cost of a bottle or can of strong beer purchased by said club and thereafter served or dispensed to its members as aforesaid is approximately 6-⅔ units, of the bookkeeping value of 6-⅔¢."

At the outset it may be stated that despite many notions to the contrary, constitutional prohibition was not wholly repealed or rejected by the people of Kansas as a result of their mandate at the general election in November, 1948. In fact, the constitutional prohibition of intoxicating liquors was changed or modified to give the legislature limited power to regulate, license and tax the manufacture, sale, possession and transportation of intoxicating liquors with the express proviso that the open saloon should be forever prohibited. Article 15, section 10 of the constitution of Kansas as the same was adopted by the voters of this state in 1948 provides:

"The legislature may provide for the prohibition of intoxicating liquors in certain areas. Subject to the foregoing, the legislature may regulate, license and tax the manufacture and sale of intoxicating liquors, and may regulate the possession and transportation of intoxicating liquors. The open saloon shall be and is hereby forever prohibited."

The legislature following the mandate of the people enacted the Kansas Liquor Control Act, G. S. 1949, chapter 41. While this act may not be perfect in every respect, it was the purpose of our recent legislature to take every possible precaution to ever abolish the open saloon in this state and to stop the illegal sale of and traffic in intoxicating liquors both by those who flouted the old law and those who may wish to violate the new one. (*State v. Coleman,* 168 Kan. 159, 164, 211 P. 2d 81.)

We will consider the plaintiff's first and second specifications of error together. Did the court err in holding that the defendants were neither offering for sale nor selling alcoholic liquors by the drink in quantities of less than one-half pint, and did the acts as related constitute maintaining, operating or conducting either directly or indirectly an open saloon?

All sections of the statutes hereinafter referred to are a part of the Kansas Liquor Control Act as published in the general statutes

of Kansas for 1949, being chapter 41 thereof. Section 41-102 (15) defines a sale as used in the act as follows:

" 'Sale' means any transfer, exchange or barter in any manner or by any means whatsoever for a consideration, and includes and means all sales made by any person, whether principal, proprietor, agent, servant or employee."

Section 41-104 provides:

"No person shall sell, barter, deliver, furnish or possess any alcoholic liquor for beverage purposes except as specifically provided in the act."

Section 41-722 expressly prohibits any shift, scheme or device for giving away or selling liquor to evade the law, and reads:

"The giving away or delivery of any alcoholic liquor for the purpose of evading any provision of section 84 [41-721] of this act or taking of orders or the making of agreements, at or within any governmental subdivision, while such sales are prohibited, for the sale or delivery of any alcoholic liquor, or other shift or device to evade any provision of this act, shall be held to be an unlawful selling."

Section 41-803 defines "open saloon" as prohibited by article 15, section 10 of the constitution and provides:

"It shall be unlawful for any person to own, maintain, operate or conduct either directly or indirectly, an open saloon. *For the purposes of this section, the words 'open saloon' mean any place, public or private, where alcoholic liquor is sold or offered for sale or kept for sale by the drink or in any quantity of less than one-half pint, or sold, offered for sale, or kept for sale for consumption on the premises where sold.*" (Emphasis supplied.)

It would serve no useful purpose to here reiterate and discuss the particular facts as the agreed statement of facts hereinbefore related speaks for itself, and we will only cover the cases and rules of law based upon the facts as agreed upon. This court dealt with a somewhat similar situation in the case of *State v. Horacek*, 41 Kan. 87, 21 Pac. 204, decided by this court in 1889. A society known as the "Arions" was incorporated for the social enjoyment of its members. The society held nightly meetings and engaged in the drinking of beer and intoxicating liquors. Horacek was a member of the society and was its steward and bartender. He drew the beer which was consumed at the society's meetings and distributed to its members who had chips and delivered them to him for the beer. Facts showed that members purchased chips from officers of the society paying twenty-five cents for eight chips, each of which was good for a glass of beer. When a member of the society was served with a glass of beer, he delivered a chip to Horacek. Horacek was

charged with selling intoxicating liquor in violation of law and found guilty. In considering whether the law had been violated, the court gave careful consideration to the transaction of selling beer for chips rather than money and in analyzing the case the court stated at page 92 of the opinion:

"But to sell the beer in any manner, directly or indirectly, would under the other facts of this case constitute an offense; and the disposition of it to members in the manner in which it was disposed of in the present case would, we think, constitute a sale. The case of *The State v. Nickerson,* 30 Kas. 545, tends to support these views. (See also the following cases: *Marmont v. The State,* 48 Ind. 21; same case, 1 Am. Crim. Rep. 447; *Martin v. The State,* 59 Ala. 34; *Rickart v. The People,* 79 Ill. 86; same case, 2 Am. Crim. Rep. 385; *The State v. Mercer,* 32 Iowa 405.) The beer was not distributed to or among the members in equal shares, nor was it in fact distributed to them at all except as they purchased it. Under their rules some of the members might get all the beer and the others none. Those purchasing the chips would get beer while the others would not get any. The sale of the chips was really a sale of the beer, as the chips represented the beer and nothing else."

When the factual situation existing in the instant case is viewed in the light of facts disclosed in the quoted case, there appears to be little if any difference in the plan. The scheme and subterfuge employed by defendants in the instant case in selling whiskey and the court's reasoning in the Horacek case is just as sound and forceful today as it was at the time the mentioned case was decided. Again in 1903 this court had occasion to consider a similar situation in the case of *State v. Peak,* 66 Kan. 701, 72 Pac. 237. In this case Peak was manager of a club known as the Kansas Utopia Association, and was convicted of selling intoxicating liquors and keeping a nuisance, and appealed his conviction to this court. Evidence disclosed that the association was organized for the purpose of keeping on hand a quantity of intoxicating liquors for the use of members of the association and their invitees. The association maintained clubrooms where a stock of liquor was kept and members purchased such liquors by the drink, bottle, or otherwise. A person might become a member of this association by paying the defendant the sum of $2. The $2 dues paid was used in the purchase of liquor and when a person became a member of the association, he immediately became a joint owner with all other members of whatever stock of liquor was on hand at the time. A glass of beer was five cents and whiskey ten cents. It was customary for members as they purchased either beer or whiskey to

have the price therefor charged against the $2 which had already been advanced to Peak. The court in passing on the question presented stated: (p. 705.)

"The main contention of appellant is that the facts established by the evidence are not in violation of the prohibitory law, and this question is presented here upon the following instruction, given by the court, which appellant claims was erroneous:

" 'Where any number of persons associate themselves together for the purpose of procuring intoxicating liquors, and a member of such association pays to the manager or agent for such association money for the purpose of procuring intoxicating liquors, and such liquors are procured by the manager or agent of such association, and kept on hand for distribution among the members of such association, and where a member thereof procuring any part of such intoxicating liquors must either pay to the manager or agent the price thereof, or have the same charged against a fund theretofore advanced, such transaction would constitute a sale.'

"The instruction as applied to the facts in this case was correct. It appears from the evidence that the Kansas Utopia Association, stripped of its subterfuges and pretenses, was a whiskey saloon—a shift, devicefully planned to evade the prohibitory law, so patent that it hardly deserves the serious consideration of a court. Laws are made to be observed, not violated. Courts look with disfavor upon cunning devices to evade the law. This device does not possess the charm of novelty. A man could patronize this saloon by paying two dollars to become a member. When he wanted a drink, or any quantity of intoxicating liquor, he paid for it, or, if the quantity did not exceed the value of two dollars, he could have it charged against the money he had advanced."

During the long history of constitutional prohibition in this state, numerous cases have been before this court wherein various schemes, shifts, devices and subterfuges to evade provisions of the former intoxicating liquor law were strenuously presented and argued as legal sanction and authority for doing unlawful acts. In every case of this category which has come to our attention, this court has vigorously and quickly stripped such shifts, devices and subterfuges of their external and sometimes ingenious wrappings and found them to be nothing more than subtle and artful attempts to evade and circumvent the law. Other decisions than those quoted bearing on the general proposition are *State v. Ross,* 86 Kan. 799, 121 Pac. 908; *State v. Topeka Club,* 82 Kan. 756, 109 Pac. 183; *State v. Poggmeyer,* 91 Kan. 633, 138 Pac. 593.

As to cases from foreign jurisdictions, as early as 1875 the case of *Rickart v. The People,* 79 Ill. 85, was before the Illinois court. In that case an action was commenced on a complaint to recover

a fine imposed for a violation of the "Dram Shop Act." That section made it unlawful for any person to sell intoxicating liquors of any kind in less than one gallon or in any quantity to be drunk on the premises. The statute made the giving away of intoxicating liquors or other shift or device to evade its provisions unlawful selling. A copartnership or company was organized, the object of which was set forth in the articles of association. Any white male citizen above the age of twenty-one years and of good moral character could become a member. The association had officers whose duties were defined. The association rented a clubroom formerly occupied by the defendant's bar. Tickets with figures printed thereon from one to twenty were issued to persons on becoming members of the association. Such tickets cost $1. Whenever a member wanted anything at the bar he presented his ticket and it was punched for each glass of beer or whiskey. Any person, it appears, could become a member of the association simply by buying a ticket. In its opinion the court said: (p. 90)

"All this is plainly a device, on the part of defendant and those who desire to patronize his bar, to avoid the provisions of the law, and to enable him to sell intoxicating liquors at retail, as he had formerly done, without first obtaining a license to keep a dram shop. The purpose and object is so transparent, that the subject need not be seriously discussed. The whole thing is a subtle artifice, planned with a view to avoid the penalties denounced against persons violating the law. The ticket arrangement was simply paying in advance and getting the liquors at convenient seasons, when desired. The proposition is absurd, that the ticket-holders really owned the liquors with which the bar was stocked. Each party bought tickets, to be used at the bar when he wanted anything, and for no other purpose. . . . Buying tickets, as we have seen, was simply buying 20 drinks and paying for them in advance. Each one paid for whatever he got, as he would have done had he bought of a licensed seller. It is preposterous to assume that a number of persons may, with impunity, associate themselves together as a firm, or voluntary company, purchase a quantity of liquors and retail them out to the several members as they would to strangers. Such an enterprise is unlawful, and all concerned would be guilty of violating the statute. If such a device could be tolerated, it would render all legislation on this subject nugatory. But the alleged association is a mere fiction."

A somewhat similar device and subterfuge was presented to the Iowa court in *State v. Mercer*, 32 Iowa 405. In that case there existed an organization known as the Winterset Social Club, the purpose of which was to supply members with intoxicating liquors to be used as beverages. Persons became members by signing their names in a book and buying tickets. The manner of operation was

not fully explained but it was disclosed that defendant had possession of liquors and sold tickets to members of the club which were exchanged in payment of liquors served by the club to its members. The court in that case said:

". . . The fact that, under the arrangement of selling tickets, the members of the club became the owners of the liquors to the extent of the money paid, does not make the sale of the liquors in that way lawful. The act of selling the tickets was the sale, in fact, of the liquors. It is confessed that such sales were for the purpose of supplying the liquors to the purchasers to be used as a beverage. . . . The sale of the tickets was, in fact, the sale of the liquors, which was for the purpose of their unlawful use. . . . That the defendant resorted to a device, craftily planned and boldly executed, for the purpose of violating the law, is most patent. He attempted to make the violation of the law respectable by getting up a 'social' organization to support him. This very organization would tend to spread with rapidity the appetite for intoxicating liquors and thus increase the evils of the unlawful traffic in which he was engaged."

In view of the foregoing, the inescapable conclusion is that the dispensing of alcoholic liquors in the manner hereinbefore set out in this opinion is a subterfuge if not an actual sale, either one of which is clearly prohibited by the Kansas Liquor Control Act, G. S. 1949, chapter 41, *supra,* and the premises and all property kept and used in connection therewith constitute a common nuisance to the people of Kansas as defined by section 41-805 of the act and the state is entitled to have such nuisance abated and permanently enjoined and recover its costs therein. Having reached this conclusion, other questions raised by plaintiff need not be discussed.

The judgment of the lower court is reversed and the case remanded with directions to the trial court to enter judgment against defendants abating the nuisance and permanently enjoining the same, and tax the costs of this action against defendants including an allowance of a reasonable attorneys' fee to the attorneys for the state of Kansas, all in accordance with sections 41-805 and 41-806 of the act. It is so ordered.