Baxter Lee HARRELL, Jr., Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12951.

Court of Criminal Appeals of Oklahoma.

Feb. 8, 1961.

Lewis F. Oerke, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Presiding Judge.

Baxter Lee Harrell, Jr., hereinafter referred to as the defendant, was charged by information in the county court of Kiowa County with the crime of unlawful sale of intoxicating liquors. He was tried before a jury, found guilty and his punishment fixed at 30 days in the county jail and to pay a fine of $100.

The defendant in the time prescribed by law lodged his appeal in this Court. He relies for reversal upon the grounds that the transaction upon which the charge was based did not constitute a sale under the theory of the law as generally publicized and which was reduced to written form by the Alcoholic Beverage Control Board. He contends also that the court erred in refusing to admit evidence as to the policy of the ABC Board in regard to the operation of private clubs. Said evidence being tendered attempting to show that Harrell's Club, Inc. was being operated within the rules prescribed by the ABC Board.

A review of the record shows that two agents from the ABC Board on April 8, 1960, went to a place known as Harrell's Club, located approximately one-fourth mile south of the town of Snyder, situated in Kiowa County. Upon entrance to the club the defendant, Harrell, asked the agents for their names. Agent Harbolt gave the fictitious name of W. Baker, and agent Manning gave likewise a fictitious name, to-wit: Pete Hodges. The defendant entered the phony names on the Club's book and gave to the agents a membership card in exchange for $1. The agents entered and were served bourbon and a whiskey sour. The agents returned to the club on April 15 and were admitted without showing their cards. They were seated at a table and ordered a double shot of bourbon and a whiskey sour as related by the testimony of agent Harbolt:

"A. When we walked in Mr. Harrell asked us how we was and we told him fine. I ordered a whiskey sour and Mr. Manning ordered a double shot of straight bourben. Then I walked over to the jute box and started playing the jute box.

"Q. What was done with the double shot of Bourben? A. After a very few minutes—we were stalling for ten minutes—I walked over to where Mr. Manning was and he showed me this Glass with this Bourben in it; he said he didn't get very much and I said to order another, so he ordered another double shot and the girl brought it to us and she said, "You haven't drank what I brought you the first time"; and he said something about he

liked a good drink, or something. I poured it in that, and about that time, after he paid for it, Sheriff Peters walked in the place and at that time Mr. Manning acquainted himself and placed Mr. Harrell under arrest.

"Q. Can you state to the court and jury who brought the whiskey to the table? A. The black headed girl over there: Opal.

"Q. Opal Gadry? A. Yes, sir.

"Q. Where was Dora Mae Caudill at that time? A. Part of the time she was behind the bar.

"Q. Where was Mr. Harrell? A. He was just in there, around there. I didn't pay too much attention; I believe he was sitting at a stool part of the time.

"Q. You say Mr. Manning paid for the whiskey? A. Yes, sir.

"Q. How did he pay for it? A. He paid cash; I couldn't tell you the denominations.

"Q. Do you know how much it was? A. Fifty cents for the whiskey sour and one dollar each for the double shot of Bourben.

"Q. Did you examine it to tell whether or not it was Bourben? A. Yes, sir. When we got ready to pour it in the empty bottle Sheriff Peters and I went out to the car and got the bottle and I tasted it to see if it was whiskey.

"Q. And it was?"

Sheriff Peters of Kiowa County then entered upon the scene and arrested the defendant. These facts constitute the premise upon which the charge of unlawful sale of alcoholic beverage was based.

The defendant testified in his behalf and introduced exhibits showing that Harrell's Club was duly incorporated under the laws of Oklahoma. The Articles of Incorporation show the officers to be the defendant Baxter Lee Harrell, Jr., Baxter Lee Harrell, Sr., and Ted R. Harrell. Defendant testified as follows in reference to the club's membership:

"Q. Then under the constitution and by-laws what arrangement did you set up for the membership in the club; did you have a membership card? A. Yes, the little yellow card.

"Q. If any person wants to be a member are you the only person authorized to take members? A. Yes, sir.

"Q. When a person appears at the door and gives his name, you talk to him and issue a membership card? A. I am the only one authorized to.

"Q. Did you issue a membership card to W. Baker? A. Yes, sir."

*      *      *      *      *      *

"Q. Then, in the operation, does every person that comes in the club agree to the whiskey pool? A. If he drinks whiskey inside—if he brings his own bottle he doesn't have to join the pool.

"Q. Anyone— A. Anyone that drinks in there has to join the pool?

"Q. At the time these men appeared there did you at the same time make up their whiskey pool cards? A. I did."

Defendant further testified as follows:

"Q. Mr. Harrell, are you authorized by the directors of this club to purchase whiskey for the whiskey pool? A. Yes, sir.

"Q. From that whiskey pool did the members get whiskey from the pool? A. Yes, they did.

"Q. To show whether or not hijacking is in process, or going on, this is about one-third of a single shot that the members pay into the club, fifty cents? A. Fifty cents.

"Q. How much of the fifty cents goes into the pool for whiskey? A. Twenty cents.

"Q. A double shot is one dollar and forty cents goes into the pool? A. Yes, sir.

"Q. There is thirty cents overhead in the operation of the club? A. Yes, sir, thirty cents to pay taxes on.

"Q. In this whiskey club you recover eighty cents? A. Yes, sir, to replace it."

Defendant's paramount contention is that his modus operandi did not constitute a violation of the laws of the state. He argues that the clubs method of dispensing liquor by the drink did not constitute a sale and that the so-called "liquor pool" maintained by the club came within the rules and policy prescribed by the ABC Board as they pertain to dispensation of liquor by the drink in a private club. During cross-examination of the ABC agents, defendant attempted to elicit from them the Board's interpretation and policy as to private clubs, liquor pools, etc. The county attorney objected to the introduction of this testimony. The court sustained the objection. Defendant saved his exception and argues that the court's ruling constituted error. Defendant apparently was attempting to show that his method of operation was in conformity with the Board's interpretation of the law as set forth in a written instrument compiled by the Board and later mailed to various clubs in operation. The memorandum mailed listed several methods by which liquor could be dispensed by the drink without being in violation of the liquor laws of Oklahoma.

■ The trial judge did not err in excluding this testimony. The ABC Board is an enforcement agency under the Executive branch of government. The ABC Board was created by Art. 27 of the Oklahoma Constitution, but they have only such power as was delegated to them by the legislature and the extent of their authority is found in HB 825 of the 27th Legislature which, 37 O.S.Supp. § 501 et seq., among other things provides that the Board shall not adopt or promulgate any rule or regulation inconsistent with this Act or with any future acts of the legislature. The legislature did not empower the ABC Board with any authority to license, control, set up, supervise, regulate, advise or bless any place or system whereby liquor is dispensed by the drink. They are charged with the responsibility of control and enforcement of the law adopted by the people and enacted by the legislature legalizing the sale of intoxicating beverages. They are not charged with the responsibility of construing the law nor to interpret its violations. That is a matter for the courts to determine. Though the Board, as any other person or entity may express an opinion, the exclusive authority of interpretation of the law rests with the judiciary. The opinions of the Board or its policy in construing what constitutes a violation of the law is by no means binding upon the Court. It was within the province of the trial court to interpret the law and instruct the jury thereon, subject only to the review of this Court. It was not error for him to exclude the testimony relative to an opinion or policy of the ABC Board or any other person's opinion as to what constituted a violation of the law.

■ As heretofore stated the paramount question for this Court to determine is whether or not the transaction as related by the facts constitute an unlawful sale of intoxicating liquor under the existing laws of this state adopted April 7, 1959. Said law in part provides in Art. 27, Sec. 4 of the Constitution:

"The open saloon, for the sale of alcoholic beverage as commonly known prior to the adoption of the eighteenth Article of Amendment to the Constitution of the United States of America, is hereby prohibited."

"The words 'open saloon' shall mean:

"Any place, public or private, wherein alcoholic beverage is sold or offered for sale, by the drink; or, sold, offered for sale, or kept for sale, for consumption on the premises.

"Retail sales of alcoholic beverage shall be limited to the original sealed package, by privately owned and operated package store, in cities and towns having a population in excess of 200. * . * * "

The language used in these provisions is not a figure of rhetoric but the truest expression of the Oklahoma electorate.

The legislature is to be commended upon the simplicity of language used in creating the above law. The law is stated with brevity and with such simple clarity that legal training is not necessary to construe or interpret its meaning. The intent is without question or ambiguity. The legislature and the people undoubtedly intended to bar and preclude the sale of liquor by the drink whether in private or public, by any person, partnership, corporation or association.

■ There can be no doubt that in a strict legal sense the transaction described by the testimony in the case at bar constituted an illegal sale of intoxicating liquor and was in violation of Art. 27, Sec. 4 of our Constitution. All of the elements of a sale or an executed contract are present. The fact that Harrell's Club was duly incorporated makes no difference. In the instant case defendant testified he was authorized by the club to purchase whiskey for the whiskey pool and from that pool the member of the club got whiskey by the drink. The corporate body, a legal entity, became the owner of the whiskey and through its servant the defendant delivered it to the purchaser at their call and received a fixed compensation in money therefor. The property in the whiskey passed to the purchaser and the money paid in was received for and became the property of the corporation. The defendant contends that the compensation paid was for the beverage used in mixing the drink and the service rendered and a small amount of money sufficient to replenish the pool and that no profit was made on the liquor itself. Profit is not a necessary ingredient of a sale. Indeed many sales are made at a loss. However, the record reflects that defendant received $1.50 for a double shot of bourbon, a whiskey sour and a small cup of water. It is apparent that the charges were not out of line with a regular bar room tab. If this court approved such a transaction as being within the law it would nullify that provision of Art. 27, Sec. 4 prohibiting the open saloon.

Since the adoption of the constitutional amendment legalizing and limiting the sale of alcoholic beverages in duly licensed retail stores only, numerous and ingenious devices have sprung up throughout the state to evade the law, and do indirectly that which the law will not permit them to do directly. The question therefore arises whether a devise or scheme however ingenious, can conceal the true nature of a transaction and render ineffective "prohibition" against the open saloon and declare it to be a nullity. Apparently the most common scheme is the one under which the defendant was supposedly operating and referred to as the "pool system". This devise or scheme creates what appears to be a camouflaged co-operative tippling house or bar whereby an individual is permitted to purchase a membership in a private club and he thereafter deposits a stipulated sum of money in what is known as the "liquor pool". The money deposited by each of the members in the club is then used to purchase a supply of various types and brands of liquor and the members supposedly own the liquor, with the club having no interest therein. The club owns and maintains a bar with all the non-alcoholic ingredients required to prepare mixed drinks. A member may then order any type of drink from the bar, his deposit with the pool is charged according to the amount of liquor used in that particular drink and a charge is likewise made by the club for the non-alcoholic ingredients and service charge. He is likewise notified that the amount of his deposit with the pool has decreased according to the amount of liquor he has consumed that month and he reimburses the pool for the difference between the amount of the original deposit and the amount charged against his pool account. Under the auspices of such a scheme the operation of such a place is making mockery of the law and their operation is repugnant to the open saloon law as related in Art. 27, Sec. 4 of our Constitution. These ingenious methods to

evade the law are not new. These devises or schemes have been instituted throughout the years, time and time again, successful only during the complacency of law enforcement. It is unlawful for any person, natural or artificial, or for any association of persons to sell intoxicating liquor by the drink either directly or indirectly, under any circumstances and at any place. No scheme or devise, however subtle should be permitted to serve as an evasion of the law if the method employed in any way involves the elements of a sale. The courts in various jurisdictions have passed upon the legality of devised methods for many years. In 1914 in the case of Deal v. State, 14 Ga.App. 121, 80 S.E. 537, the Court of Appeals in Georgia had occasion to elaborate upon the legality of a drink dispensing system very similar to the "liquor pool". The court said:

" '1. All who procure, counsel, command, aid or abet the commission of a misdemeanor are regarded by the law as principal offenders and may be indicted as such.' The manager of a social club, who orders intoxicating liquors for the use of its members, and who either directly or indirectly procures, counsels, commands, aids or abets in the making of a sale of such liquors, is guilty as a principal. This is true even though such manager may not have been present when tthe particular sale was made, nor had knowledge of such sale until after it was consummated.

"2. Where a number of persons each contribute money to an agent, who purchases a stock of intoxicating liquors and thereafter dispenses, upon the order of one of such persons, a quantity of the liquor in exchange for a book of coupons which had been purchased either by such person or by the person to whom the liquor was delivered, the transaction is a sale in violation of the prohibition law, notwithstanding the persons for whose benefit the liquor was purchased composed a bona fide club, organized for social and intel-

lectual welfare, and the use of the liquor was only an incident. to the main purpose of the club, and although no profit is made on the sale. And this is true whether the persons have become incorporated as a social club or whether they constitute a voluntary association of persons for mutual pleasure and benefit."

In the body of the opinion the court said:

"The law looks at the substance of things. So that if an agent of a corporation, with money in the treasury of the corporation, purchased property and received and held it for the corporation, in law the title would be in the corporation without reference to what fiction had been used in making the purchase or in holding the property. If the shareholders in a corporation each contribute their own money, and this money is used for the purchase of property, and title thereto is in the corporation, and not in the share holders. And so if the members of an incorporated social club contribute a sum of money and this money is exchanged for liquors, to be kept by the club for the use of the members, title to the liquors is as much in the corporation as is the property of any other corporation which is purchased with the money contributed by the shareholders and held and used for their benefit. If one obtains a quantity of whisky from a corporation by the payment of money or its equivalent, in coupons or in any other way, the transaction has all of the elements of a sale; title has passed out of the corporation and has been acquired by the person who furnished the money or other thing of value. It is immaterial whether the transaction disclosed by the present record be treated as a sale by the club to the member, and by the member to Register, or as a sale directly from the club to Register; in either event, the accused is guilty. Nor is the transaction to be regarded as any the less **a** sale because the club was unincor-

porated and simply a mere voluntary association of persons. If 100 people should order a barrel of whisky and each contribute an equal amount and pay for the whisky, the title passes into all of them, and they own the liquor in common. In such a case there would be no objection to a plan of distribution which did not involve the elements of a sale, but, if each of these persons should be allowed to withdraw a drink at a time and pay therefor a price which had been agreed upon by all of them, the transaction would be a sale. It would be a sale because title to the drink had been in all of the persons in common, and when it was transmitted to the individual who paid therefor a price agreed upon there was a sale by the 99 to the one of all of their interest in the whisky purchased. The infinitesimal interest of the one person in the drink thus obtained would not prevent the transaction from being a sale."

In State ex rel. Ben. & Protective Order of Elks, Lodge No. 1529 v. Livingston, 159 Fla. 63, 30 So.2d 740, 741, the Supreme Court of Florida said in part:

"While this Court has never ruled on the specific point, the overwhelming weight of authority upholds the view that regardless of how the statute may describe the transaction, the serving of liquor by a bona fide social club is a 'sale' within the meaning and definition of the Constitution, and the manner of serving, paying for or other ways to cloak its true meaning cannot in anywise change or alter the transaction."

In Williams v. State, 132 Tex.Cr.R. 188, 103 S.W.2d 380, 381, headnote 3, reads:

"3. Manager of athletic club who acted for members in buying ten cases of beer of more than one-half of 1 per cent of alcohol by volume for resale to members in dry area under rules by which each member was to pay manager for beer and price with profits, if any, was to be deposited in members' deposit account, which was to be used to pay expenses in operation of club, held to have possession of beer for purpose of sale in a dry area within statute (Vernon's Ann.P.C. Arts. 666–3a, 666–4(b), 666–23a)."

In the later Texas case of Backues v. Woods, Tex.Civ.App., 218 S.W.2d 892, headnote 2 reads:

"Where members of veteran's organization located in dry county each gave clubhouse custodian $5 and signed contract authorizing him to buy each a case of beer, and custodian purchased cases of beer and brought them to clubhouse and placed them in cellar, and members were given cards entitling them to 24 bottles of beer, beer was an 'illicit beverage' within meaning of Liquor Control Act, there was a 'sale' of beer in violation of act, and provision of act making it unlawful to 'store' beer in dry area was violated, entitling Liquor Control Board to declare a forfeiture of beer. Vernon's Ann.P.C. Arts. 666–1 et seq., 666–2, 666–3a, 666–4(b), 666–23a, 666–29(a), 666–42(a, b), 667–1 et seq."

In the body of the opinion the court said in part:

"The beer was bought by Woods as an employee of the Post as a bulk purchase, with no case or bottle being segregated or designated as that of any individual member; it was paid for out of the club fund. The beer so purchased belong to the Post. It is true that the amount of money required for the purchase, and even more, had been deposited with the Post Quartermaster and that the member making a deposit of $5 received a card which entitled him to receive 24 bottles of beer, as a person who purchases a meal ticket is entitled to a specified number of dinners. When the member asked for a bottle of beer and presented his card to be punched, he was entitled to and did receive the beer. This constituted

a sale to the member at the time he presented his card and secured the beer."

State of North Carolina v. Neis, 108 N.C. 787, 13 S.E. 225, 226, 12 L.R.A. 412, 413:

"Here the individuals of the club, treating themselves as unorganized, furnished through defendant to themselves, from a common stock, the drinks at cost, and with the money received therefor replenished the common stock. When in the present case an individual received drinks for himself and friends, he clearly did not receive the identical liquor which belonged to himself, but he received liquor which belonged mostly to others, and in which he had a minute undivided interest. For his money he received in exchange liquor which belong to several others, as well as to himself, and converted it to his sole and separate use. Before the transaction the money was solely his, and the liquor belonged to several. By virtue of the transaction, and in exchange for the money, the liquor became his sole and separate property. This is surely a sale. It has every element of a sale. It cannot affect the transaction that subsequently the defendant would purchase the same amount of liquor in value for the party paying the money, and mingle it in the common stock."

(For a similar holding as to an organized club, see State v. Lockyear, 95 N.C. 633)

◼ Our sister state of Kansas, one of the last to repeal prohibition, was confronted with the same problem. Their Supreme Court passed upon the question in 1952. In the case of State v. Larkin, 173 Kan. 112, 244 P.2d 686, the court said:

"Syllabus 1. Legislative purpose in enacting Liquor Control Act was to take every possible precaution to abolish the open saloon and to stop the illegal sale of and traffic in intoxicating liquors.

"Syllabus 2. System of dispensing intoxicating liquor whereby any member of a club could contribute to a fund for purpose of procuring and having on hand a stock of intoxicating liquors and in return receive coupon books with which he could obtain intoxicating liquors at the club, constituted a subterfuge if not an actual sale of intoxicating liquor, either one of which was prohibited under Liquor Control Act."

In passing upon the matter the Supreme Court of Kansas in an earlier case, State v. Peak, 66 Kan. 701, 705, 72 P. 237, 238 stated:

"Where any number of persons associate themselves together for the purpose of procuring intoxicating liquors, and a member of such association pays to the manager or agent for such association money for the purpose of procuring intoxicating liquors, and such liquors are procured by the manager or agent of such association, and kept on hand for distribution among the members of said association, and where a member thereof procuring any part of such intoxicating liquors must either pay to the manager or agent the price thereof or have the same charged against a fund theretofore advanced, *such transaction would constitute a sale*."

Therefore in accord with the above authorities it is obvious that Harrell's Club operated by the defendant, when stripped of the subterfuge and pretenses, was a whiskey saloon, devicefully planned to evade the open saloon law and of such bold nature that it hardly deserves the serious consideration of a court but the law enforcement agencies instead. Laws are made to be observed, not violated. Courts look with disfavor upon cunning devises created to evade the law. The Supreme Court of Kansas states it well in the Larkin case, supra, wherein they said:

"In every case of this category which has come to our attention, this court has vigorously and quickly stripped such shifts, devices and subterfuges of their external and sometimes ingenious wrappings and found them

to be nothing more than subtle and artful attempts to evade and circumvent the law."

Any person or group of persons whether it be a corporation, partnership or association who dispenses whiskey by the drink under the scheme heretofore described and commonly referred to as the pool system is in direct violation of Art. 27 of our Constitution. They are operating no more than an open co-operative saloon. There is nothing in the law to prevent one from taking his own bottle to a private place and having drinks therefrom. He may have the drink mixed, and pay for that service, but the drink must be from his own separate, distinct and individual bottle owned exclusively by him. When the bottle becomes co-mingled with other bottles and other drinks as to lose personal identification, birth is then given to the open saloon. The sale of liquor by the drink is absolutely prohibited in this state, and it is our duty to declare that every sale, directly or indirectly, and every scheme or device which involves the elements of a sale, is in violation of the law. This court deems it wise to also alert retail liquor stores of the hazard they will necessarily encounter if they sell alcoholic beverages to any person be it individual, corporation, partnership or association, for the purpose of resale. HB 825, Sec. 21(g) of the 1959 Session prohibits a package store from selling alcoholic beverages for the purpose of resale, and a retail dealer who engages in such practice not only is guilty of a misdemeanor but forthwith subjects his license to revocation.

The Court herein has attempted to clarify the law and emphasizes the fact that the sale of alcoholic beverage by the drink is absolutely prohibited by the Constitution of this state. It now becomes a matter for law enforcement. This Court has no hesitancy in confirming the expressed will of the people, that the open saloon cannot exist in Oklahoma until by Constitutional amendment the law is changed. Whether it be done directly or indirectly, by device or scheme, by subterfuge or otherwise, this Court will not place approval thereon where a color of sale exists.

For the foregoing reasons and in conformity with the authorities stated herein, the judgment and sentence of the trial court is hereby affirmed.

BRETT and BUSSEY, JJ., concur.