No. 45,540

Howard Willcott, *Appellant,* v. E. V. D. Murphy, Director, Alcoholic Beverage Control, and Alcoholic Beverage Control Board of Review, *Appellee* and *Cross-Appellant.*

(465 P. 2d 959)

Opinion filed March 7, 1970.

*Kay McFarland,* of Topeka, argued the cause, and *T. M. Murrell, George A. Scott, Jack A. Quinlan* and *John A. Bell,* all of Topeka, were with her on the briefs for the appellant.

*Kenneth R. Heer,* Assistant Attorney General, assigned to Alcoholic Beverage Control, argued the cause and was on the briefs for the appellee and cross-appellant.

The opinion of the court was delivered by

Kaul, J.: Plaintiff-appellant, a retail liquor dealer, licensed under the Kansas Liquor Control Act (K. S. A. 41-101, *et seq.*), instituted this action to obtain a declaratory judgment determining the validity of a memorandum issued by the State Director of Alcoholic Beverage Control.

The controversy concerns the sale of beer as an alcoholic beverage,

defined in K. S. A. 41-102 (now 1969 Supp.), as distinguished from a cereal malt beverage (K. S. A. 41-2701 [e]).

On March 31, 1966, the Director of Alcoholic Beverage Control (hereafter referred to as the director) issued his memorandum No. 66-19 which reads in pertinent part as follows:

"SUBJECT: *COLD BEER.*

"The following is an excerpt from the minutes of the March 25 meeting of the Alcoholic Beverage Control Board of Review:

" 'The Board, after due consideration of this question, finds that the sale of cold beer provides an inducement and service prohibited by the laws of the state of Kansas.'

"This decision does not constitute a policy change but is being sent you because of the general interest in the matter.

"The Director and the Board of Review discussed this subject at several of the Board's regular meetings. All information and material which had been submitted to the Director on the matter was considered.

"It should be noted that the decision was based on legal rather than administrative grounds.

"/s/  J. R.  Cheney
"J. R. CHENEY, Director."

The plaintiff in his petition alleges in substance that the memorandum is an unauthorized use of the authority granted to the defendant to regulate the sale of alcoholic beverages under statutes dealing with the subject. Plaintiff contends there is no statutory authority for the position taken by the director.

In his answer the director admits the existence of a controversy but denies that any rights of the plaintiff are being, or have been, infringed. The director further alleges:

". . . [T]hat defendant's Memorandum 66-19 has no legal effect, but is a mere statement of policy and a finding that the sale of 'cold beer' is prohibited by law."

The director's position, as we understand it, is that the issuance of the memorandum is authorized by K. A. R. 13-6-1 and that the mandate of the memorandum is authorized by K. A. R. 14-3-15, which is the director's interpretation of K. S. A. 41-308. The import of the regulations and statute, referred to, will be examined in the course of this opinion.

During the course of the litigation Jerry Muth was substituted as Director, succeeding J. R. Cheney who issued the memorandum and was Director at the time the suit was filed. Mr. Muth has since been succeeded by E. D. V. Murphy, the present Director.

The parties agree that a justiciable issue has been joined and is

a proper controversy to be determined by declaratory judgment under the provisions of K. S. A. 60-1701.

The parties stipulated and agreed that the discretion of the director was not at issue but that the controlling question was one of statutory construction.

The trial court heard considerable testimony, describing and explaining the technique in the several processes used in the manufacturing and packaging of beer and the methods commonly followed by the industry in the handling and distribution of the packaged product. The evidence developed that there are three types of beer distributed to Kansas retailers.

Draught beer was described as not pasteurized nor processed by either a "sterile-fill" or a "millipore" method. Draught beer, because of the nature of containers in which it is packaged, is also referred to as keg beer. It is generally packaged in containers larger than ordinary bottles or cans.

Pasteurized beer was described as having been heated in order to kill yeast cells and microorganisms, which process protects the flavor, odor and taste.

Millipore process beer and sterile-fill beer are processed through systems of ultra-fine filtration which serves a purpose similar to that sought by pasteurization in removing yeast cells and microorganisms.

For purposes of our discussion, millipore process, sterile-fill and pasteurized beer will be referred to collectively as pasteurized beer, since the evidence, as to the handling and storage standards, the effect of heat and light, and the rate of deterioration, is substantially the same with respect to each of these types of beer.

The testimony was undisputed and the director concedes that draught beer must be continuously maintained at temperatures between 38° and 42° Fahrenheit, and that at a high temperature it deteriorates rapidly as a result of secondary fermentation. All beer wholesalers in Kansas are required by their supplying brewers to have facilities for refrigeration of draught beer and do, in fact, have such facilities; while unrefrigerated draught beer decomposes rapidly and quickly becomes not palatable; it is not dangerous to health.

The evidence reflects that deterioration of all types of beer is accelerated by heating, freezing, light, time and excessive motion, and that it is harmed by being subjected to wide variations in

temperatures. All of the witnesses agree that controlled refrigeration is necessary for the storage of draught beer and slows down the rate of deterioration of pasteurized beer. Witnesses were generally in agreement that optimum temperatures for storage of pasteurized beer falls within the range of 32° and 70° Fahrenheit and that the rate of deterioration increases as the temperature increases.

The evidence discloses that only one brewery requires wholesalers to refrigerate pasteurized beer. All brewers require either a rotation of the retailer's stock, whereby oldest beer is sold first, or a pickup system by which wholesalers are required to pick up beer held in a retailer's stock, if held for periods varying from ninety days to twenty weeks.

After hearing the evidence, the trial court made extensive findings of fact and concluded that the storing of draught beer under controlled conditions of refrigeration is not a service and, therefore, not prohibited by 41-308, *supra*, but that the storing of pasteurized and millipore process beer under refrigeration was a service and, therefore, prohibited by statute.

Plaintiff has appealed from this latter conclusion and the director has cross-appealed from the former.

The question presented requires an examination of the relevant provisions of the Kansas Liquor Control Act. In order to ascertain legislative intent and purpose, courts should consider and construe together all parts of an act bearing upon the issue under consideration. (*State v. Sumner*, 169 Kan. 516, 219 P. 2d 438.)

The meanings to be ascribed to terms denominating various alcoholic products, capable of being consumed as a beverage and to other significant terms used in the Act, are set out in the definitions section. (K. S. A. 41-102 [now 1969 Supp.]).

K. S. A. 41-209 prescribes in eight subsections the powers and duties of the director.

K. S. A. 41-210 (now 1969 Supp.) deals specifically with the adoption of rules and regulations by the director and submission thereof to the Alcoholic Beverage Control Board of Review for approval. The statute directs the adoption and promulgation of such rules and regulations as shall be necessary to carry out the intent and purpose of the Act.

K. S. A. 41-211 sets out the scope of rules and regulations to be adopted by the director.

Under the sections referred to the director is granted broad

authority to adopt regulations necessary or convenient to the administration and enforcement of the intent, purpose and requirement of the Act. In other words, the authority of the director is limited only by the intent, purpose and requirement of the Act.

In the instant case it is conceded that the regulatory authority, exercised by the director, must stem from the intent and purpose found in the provisions of 41-308, *supra*, which prescribes the rights of a licensed retailer as follows:

"A retailer's license shall allow the licensee to sell and offer for sale at retail and deliver in the original package, as therein prescribed, only in the premises specified in such license, alcoholic liquor including beer containing more than 3.2 percent of alcohol by weight for use or consumption off of and away from the premises specified in such license, but not for resale in any form: . . ."

The second portion of 41-308 details the prohibited acts by a retailer as follows:

". . . [T]he holder of a retailer's license shall not sell, offer for sale, or give away or permit to be sold, offered for sale, or given away in or from the premises as specified in such license any service, or thing of value whatsoever except alcoholic liquor in the original package, nor shall he furnish any entertainment in such premises or permit any pinball machine or game of skill or chance to be located in or on such premises."

From the director's testimony it appears that he relied on the term "any service," as used in the prohibitory portion of the statute promulgating K. A. R. 14-3-15 which reads:

"*Inducements with sale of alcoholic liquor prohibited.* No retail licensee shall, directly or indirectly, offer or furnish any gifts, prizes, coupons, premiums, rebates, or similar inducements with the sale of any alcoholic liquor."

Based on this regulation, according to the director's testimony, the memorandum in question was issued.

Reduced to simple terms, the question is whether the storage of beer under conditions of controlled refrigeration by a retailer falls within the contemplation of "any service" which the legislature intended to prohibit by the language used in 41-308, *supra.*

In the first, or authorization, portion of 41-308 a licensed retailer is allowed to sell beer or alcoholic liquor in the original package. In the second, or prohibitory, portion the retailer is enjoined from selling, offering for sale or giving away "any service" or "thing of value" except alcholic liquor in the original package.

The prohibitions of 41-308 are interpreted and specified by the director in K. A. R. 14-3-15; gifts, prizes, coupons, premiums, rebates, or similar inducements shall not be directly or indirectly

offered with a sale. We think the interpretation of 41-308, set out in 14-3-15, is clear, definite and within the director's authority under 41-210 and 211, *supra*. The regulation (14-3-15) contemplates that something offered or furnished in addition to, and separate and apart from, liquor or beer in the original package should be barred. Can the storage of beer under conditions of controlled refrigeration be said to be similar to, or fall within, the concept of a gift, prize, coupon, premium or rebate? The director through his memorandum (66-19) says that it does. We are unable to extract such a meaning out of the words used by the director, himself, in his interpretation of 41-308, as set out in regulation 14-3-15.

The director in his testimony, as well as in his answer, indicates that authority for the memorandum must rest on regulation 14-3-15, which in turn is gleaned from 41-308, as an interpretation of the meaning thereof.

He makes no claim that the promulgation of the memorandum was a matter of necessity or convenience in the administration or enforcement of the Act. He merely says that the storage of beer under conditions of controlled refrigeration is a service under the provisions of 41-308, as interpretated in his regulation 14-3-15.

We are left with a hazy understanding as to the precise legal significance of a memorandum. As heretofore noted, the director says in his answer that a memorandum has no legal effect but is a mere statement of policy. This position of the director is in line with K. A. R. 13-6-1 which authorizes the issuance of a memorandum for the purpose of interpreting statutes and regulations. K. A. R. 13-6-1 further provides:

". . . Such interpretations shall be in the form of memoranda and shall be distributed to the board of review, its secretary, and all licensees affected thereby. Such memoranda shall not modify, revoke or extend existing regulations as the same may only be extended, modified or revoked by regulation approved by the board of review."

The memorandum in the instant case clearly amounts to an extension of regulation 14-3-15 and thus could have no legal effect. However, the parties by their actions, if not by agreement, during the course of the trial and in this appeal, clearly indicate the issue transcends the legal status of the memorandum. The trial court took the case in this framework; therefore, we shall consider it in like manner on appeal.

The trial court based its conclusions of law primarily on two findings of fact which are:

"22. Storage under controlled conditions of refrigeration is necessary to the preservation, the quality control and the purity of draught beer.

"23. Storage under controlled conditions of refrigeration is not necessary to the preservation, the quality control and the purity of pasteurized and millipore process beer."

The trial court then concluded that the storing of draught beer under controlled conditions of refrigeration, in accordance with the uniform standard of care and custom in the brewing industry, is not a service under the provisions of 41-308, *supra*, and, therefore, is not prohibited, but with respect to pasteurized beer such procedure amounts to a service and is prohibited by the statute.

The finding of the trial court with respect to draught beer is supported by the testimony of all the plaintiff's witnesses and is not denied by the director. In fact the necessity of maintaining draught beer at a low temperature is recognized by the director who knowingly permits a retailer to sell cold draught beer to a consumer, by the arrangement of having a distributor deliver the keg or container at a time specified by the retailer, when the consumer picks it up at the liquor store. This, of course, is a sale of cold beer in direct violation of the director's memorandum. The method employed in dispensing draught beer, with the director's tacit approval, demonstrates the director's inconsistent application of his own interpretation of the provisions of 41-308, *supra*.

The practical effect of prohibiting the sale of cold draught beer is to bar the sale of draught beer entirely. With respect to draught beer the right to sell it, granted a licensee under the authorization of 41-308, is taken away by the interpretation given by the director to the words "any service" as used in the prohibiting portion of 41-308. We agree with the trial court that such an interpretation was not intended by the legislature in the enactment of 41-308.

Apparently, the trial court gave more weight to the storage requirements of the different kinds of beer, than to the provisions of the Act, in arriving at its distinction between the application of the statute to draught beer on the one hand and pasteurized beer on the other. True, there is no industry wide requirement that pasteurized beer be continuously refrigerated, such as that with respect to draught beer. The trouble is there is no such distinction made in any of the provisions of the Liquor Control Act or in the director's published regulations.

The director has carefully defined in Article 6 of his regulations the nature and form of containers and labels which may be used

in the packaging of beer. In regulation 14-6-2 (1) he specifies the capacity of each container, approved for the packaging of beer, but nowhere is draught beer or any other type given a special or separate classification.

Likewise, beer is carefully defined in the definition section (K. S. A. 41-102 [3], now 1969 Supp.) of the Liquor Control Act as:

". . . a beverage, containing more than three and two-tenths percent (3.2%) of alcohol by weight, obtained by alcoholic fermentation of an infusion or concoction of barley, or other grain, malt, and hops in water, and includes, among other things, beer, ale, stout, lager beer, porter and the like having such alcoholic content."

Obviously, nothing appears in this definition that would serve as a basis for the classification of beer as to type, specific manufacturing process or necessity of storage under conditions of controlled temperature.

From a careful analysis of 41-308, *supra,* in the light of other sections of the Liquor Control Act, which we have mentioned, we believe a retailer, when licensed, is given the right to sell any beer falling within the definition of 41-102 (3), *supra,* and lawfully packaged in an original container. A right which, in the absence of legislative direction to the contrary, could not be impaired as to some beer because it required refrigeration. Since no distinction or classification as to type of beer is made by any provisions of the Act, it must follow that the storage of beer under conditions of controlled refrigeration was not considered by the legislature to amount to "any service" or "thing of value," within the contemplation of those terms as used in 41-308. If the legislature had intended otherwise it would have been a simple matter to say so either by distinguishing between types of beer or by a flat prohibition as to refrigeration. Since the legislature chose not to do so, it is not the court's prerogative to question its wisdom in this regard, nor is it within the director's authority to legislate such a prohibition by means of regulations and memoranda. (*State, ex rel., v. Columbia Pictures Corporation,* 197 Kan. 448, 417 P. 2d 255.)

When the policy of the state is declared by legislative enactment, we must assume the legislature was fully aware of all relative facets of the subject concerned. In the instant case in determining the intention of the legislature in authorizing the sale of beer by a licensed retailer, under the conditions prescribed in 41-308, *supra,* we must assume that it was aware that draught beer required con-

stant refrigeration and that the quality of all beer was subject to deterioration by exposure to light, heat and variations in temperature.

This principle was applied in *State, ex rel., v. Murphy,* 183 Kan. 698, 332 P. 2d 533, where we were confronted with an issue concerning a distributor's right to label liquor. The custom of the industry was established by the evidence and in relying on legislative awareness in determining intention, we said:

". . . In determining the intention of the legislature in providing that distributors might label liquor bought in bulk, we must assume that it was aware of this practice and that in granting to distributors the broad right to label, no qualification was intended. . . ." (p. 702.)

Our decision is not to be construed to mean that the legislature does not have the power to prohibit the refrigeration of beer by a retailer, our holding is merely that it has not done so.

Since the enactment of the Kansas Liquor Control Act we have repeatedly said the legislature has full and complete power to regulate and control all phases of traffic in alcoholic liquor. (*State v. Logan,* 198 Kan. 211, 424 P. 2d 565; *State v. Payne,* 183 Kan. 396, 327 P. 2d 1071; and *State v. Larkin,* 173 Kan. 112, 244 P. 2d 686.)

We have also recognized that the director is clothed with broad discretionary powers to govern all phases of the traffic in alcoholic liquor and is authorized to adopt and promulgate such rules and regulations as shall be necessary to carry out the intent and purposes of the Liquor Control Act. (*Chambers v. Herrick,* 172 Kan. 510, 241 P. 2d 748.) The power, however, must stem from the intent and purposes of the Act and does not include authority to take away by administrative regulation the right granted to a licensee to sell any legally packaged beer falling within the statutory definition thereof. The power to regulate, though declared to be broad, nevertheless, falls short of the power to legislate.

In accord with what has been said the judgment of the trial court is affirmed as to the cross-appeal and reversed as to the appeal.