No. 53,357

WILLIAM C. WOODS, *Appellee,* v. MIDWEST CONVEYOR COMPANY, INC., *et al., Appellants.*

(648 P.2d 234)

Opinion filed July 22, 1982.

*John J. Bukaty, Jr.,* of Bukaty & Bukaty, of Kansas City, argued the cause, and *Michael F. Delaney,* of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, was with him on the brief for the appellant.

*Brandon L. Myers,* Kansas Commission on Civil Rights, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: William C. Woods filed a complaint with the Kansas Commission on Civil Rights September 6, 1977, alleging differential treatment of white and black employees by Midwest Conveyor Company, Inc. and improper termination of his employment because of his race. A hearing was held before the Commission January 21, 1980. The hearing examiner found in favor of Woods and ordered Midwest to pay him back wages in the amount of $23,700.90 and damages for pain, suffering, and humiliation in the amount of $12,000.00. On appeal the district court tried the case de novo from the transcript of the hearing before the Commission and affirmed, adopting the Commission's findings of fact and conclusions of law. Midwest appeals. We reverse and remand with directions.

A highly summarized statement of facts is as follows:

The complainant was employed by respondent. He was a black male and was employed at entry level as a laborer. He received job training and was promoted twice until he held the classification of painter, second class, at the end of three years. During a reduction in work force another employee with more seniority "bumped" him from painter second class to the classification of production operator, which position he occupied until the time of his termination a month and a half later. Prior to termination complainant chose not to join the labor union but nevertheless took advantage of grievance procedures through union channels on numerous occasions.

The company maintained an absence control policy and points were assessed for absences from work. Complainant received disciplinary action on a number of occasions: three verbal warnings, three written warnings, and three suspensions. He received further disciplinary action for two instances of using abusive language toward supervisors. When complainant was notified of termination a confrontation between himself and the company personnel manager occurred, at which time the manager was threatened with a wrench by complainant. The manager was restrained from leaving the room, and further restrained from using the telephone to call the police. However, there was evidence of unequal treatment of whites and blacks. White employ-

ees were not held to the absence control policy and instances of absences from work and tardiness of whites were overlooked by the supervisors.

In charging discrimination complainant alleged harassment by the foreman, failure to provide equal training for black employees, disparate disciplinary action and denial of seniority rights. The KCCR found discrimination by the employer.

Appellant first contends it was inappropriate for the trial court to consider any instances occurring more than six months prior to September 6, 1977, when the complaint was filed. K.S.A. 44-1005 requires a charge of discrimination be filed with the Commission "within six (6) months after the alleged act of discrimination, unless the act complained of constitutes a continuing pattern or practice of discrimination in which event it will be from the last act of discrimination."

It is clear from the facts Woods alleged a continuing pattern of discrimination against him and other black employees. Further, prior instances are relevant to the court's determination of whether the ultimate termination was discriminatory. We hold a charge of discrimination is required by K.S.A. 44-1005 to be filed with the Kansas Commission on Civil Rights within six months after the alleged act of discrimination occurred unless the act complained of constitutes part of a continuing pattern or practice of discrimination, in which event the charge must be filed within six months after the last act of discrimination occurred. The charge was filed within six months of the last act of discrimination. This issue is without merit.

Appellant next contends the trial court erred in placing the burden of proof. K.S.A. 44-1009 states:

"(a) It shall be an unlawful employment practice:

"(1) For an employer, because of the race, religion, color, sex, physical handicap, national origin or ancestry of any person to refuse to hire or employ, or to bar or to discharge from employment such person or to otherwise discriminate against such person in compensation or in terms, conditions, or privileges of employment; or to limit, segregate, separate, classify or make any distinction in regards to employees; or to follow any employment procedure or practice which, in fact, results in discrimination, segregation or separation without a valid business motive."

The burden of proving an unlawful employment practice falls on the complainant. In discussing the burden of proof the district court stated:

"5. With respect to the burden of proof, it is incumbent upon the Complainant in the first instance to establish a prima facie case and thereafter in order to rebut the prima facie showing, the Respondent is required by clear and convincing evidence to establish that its acts or conduct were justified or nondiscriminatory. If the Respondent is successful in rebutting the prima facie showing of the Complainant, the Complainant is granted the opportunity to show by competent evidence that the acts and conduct of the Respondent were a pure pretext."

Later the trial judge ruled Woods had established a prima facie case but Midwest had not met the burden of showing by clear and convincing evidence its actions were justified or nondiscriminatory.

Appellant claims it was error to require it to show by clear and convincing evidence its acts were justified or nondiscriminatory. It cites *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-56, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981), a case dealing with Title VII of the Federal Civil Rights Act, 42 U.S.C. 200e *et seq.* In the opinion Justice Powell wrote for a unanimous court:

"In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' *Id.,* at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.,* at 804.

"The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. See *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, n. 2 (1978); *id.,* at 29 (Stevens, J., dissenting). . . .

"The burden of establishing a prima facie case of disparate treatment is not onerous. . . . The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. See *Teamsters v. United States,* 431 U.S. 324, 358, and n. 44 (1977). . . . Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone

else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See *Sweeney, supra,* at 25. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

"The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she had been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See *McDonnell Douglas,* 411 U.S. at 804-805."

We note the federal court was careful in *Burdine* to point out that the ultimate burden of persuading the trier of fact that the respondent intentionally discriminated against the complainant remains at all times with the complainant. The burden of proof never shifts to the respondent. It is the burden of going forward with the evidence that is placed on defendant after plaintiff has established a prima facie case.

Federal court decisions concerning Title VII are not controlling on this court. *Harder v. Kansas Comm'n on Civil Rights,* 225 Kan. 556, 559, 592 P.2d 456 (1979). They are persuasive authority, however. *McCabe v. Board of Johnson County Comm'rs,* 5 Kan. App. 2d 232, 235, 615 P.2d 780 (1980). Especially is this true when they concern general law in the field of civil rights. We accept and embrace the rules stated in *Burdine* as to burden of proof, prima facie case and burden of going forward with the evidence in discrimination cases.

The burden of proof in a proceeding under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.,* is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination.

Then the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for respondent's conduct. Once the respondent discharges this obligation, the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination.

The record discloses the complainant's evidence was determined by the trier of fact to establish a prima facie case of discrimination. At that point in the proceeding the burden of going forward with the evidence shifted to the respondent to introduce evidence of some legitimate, nondiscriminatory reason for respondent's conduct. We do not reach the question of whether respondent met this burden. To give evidence of some legitimate, nondiscriminatory reason for conduct does not require proof by clear and convincing evidence. The trier of fact erred in imposing such a burden of proof on the respondent.

The appellant's next issue on appeal concerns the allowance by the KCCR and the district court of $12,000.00 in damages for pain, suffering, and humiliation. Appellant makes a two-pronged argument: First, it argues the Kansas statute does not authorize the allowance of compensatory damages for pain, suffering, and humiliation, and second, the record in this case is entirely lacking in any substantial evidence to support such an award. If the first prong of the argument is upheld it will not be necessary to examine the sufficiency of evidence question.

We will first examine the statutory authority of the Commission. K.S.A. 44-1005 provides for the kind of remedial orders that may be issued by the Commission. It provides in pertinent part:

"If, upon all the evidence in the hearing, the hearing commissioners or hearing examiner shall find a respondent has engaged in or is engaging in any unlawful employment practice or unlawful discriminatory practice as defined in this act, the hearing *commissioners or* hearing *examiner* shall state the findings of fact and *shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist* from such unlawful employment practice or such unlawful discriminatory practice *and to take such affirmative action, including* but not limited to the *hiring, reinstatement, or upgrading of employees, with or without back pay, and* the admission or *restoration to membership in any respondent labor organizations;* the *admission to and full and equal enjoyment of the goods, services, facilities, and accommodations* offered by any respondent place of public accommodation denied in violation of this act, *as, in the judgment of the hearing commissioners or hearing examiner, will effectuate the purposes of*

*this act,* and including a requirement for report of the manner of compliance." Emphasis supplied.

The above provisions of the Kansas Act are almost identical to a parallel provision of Title VII of the Federal Civil Rights Act, 42 U.S.C. 2000e-5(g) which reads:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him or any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3 (a) of this title."

The federal courts uniformly hold that an award of either punitive or compensatory damages, except for back pay or front pay, cannot be recovered. *DeGrace v. Rumsfeld,* 614 F.2d 796, 808 (1st Cir. 1980), addresses this subject as follows:

"The enforcement provision of Title VII, 42 U.S.C. § 2000e-5 (g), authorizes the court, upon a finding that a defendant 'has intentionally engaged in . . . an unlawful employment practice charged in the complaint,' to enjoin the defendant and to order 'such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate.' All of the circuits which have addressed the matter have concluded that 42 U.S.C. § 2000e-5 (g) does not authorize an award of either punitive or compensatory damages of the nature plaintiff seeks. [Citations omitted.]"

For those who would like to explore the federal cases further we suggest the Annot., Title VII-Compensatory Damages, 48 A.L.R. Fed. 338. The author collects and analyzes the federal cases which bear upon the availability of compensatory damages in actions for violation of the federal civil rights act which forbids discriminatory employment practices.

As previously stated, the federal court decisions concerning

Title VII are not controlling but they are persuasive when one considers the comparability of the provisions of the two statutes.

The Kan. Const. art. 3 § 1 provides: "The judicial power of this state shall be vested exclusively in one court of justice." The KCCR is an administrative agency. Administrative agencies are creatures of statute and their power is dependent upon the authorizing statutes, so that we must find within the statute warrant for the exercise of any authority which they claim. They have no general or common law powers. They have only such powers as have been conferred upon them by law, expressly or by clear implication. 1 Am. Jur. 2d, Administrative Law § 70, p. 866; *Bennett v. Corporation Commission,* 157 Kan. 589, 596, 142 P.2d 810 (1943), 150 A.L.R. 1140 (1944).

Absent an express grant of power, an administrative agency has no power and may not determine damages and award a personal money judgment therefor. 1 Am. Jur. 2d, Administrative Law § 184, p. 988; *Straube v. Bowling Green Gas Co.,* 360 Mo. 132, 227 S.W.2d 666, 18 A.L.R.2d 1335 (1950).

We note that the powers and duties of the KCCR in K.S.A. 44-1004 include:

"(8) To issue such final orders after a public hearing as may remedy any existing situation found to violate this act and prevent its recurrence."

K.S.A. 44-1005 contains the authority of the KCCR for issuing remedial orders. The enumeration includes cease and desist orders, orders requiring affirmative action in hiring, reinstatement, upgrading, orders as to back pay, admission or restoration to membership in labor organizations, admission to full and equal enjoyment of goods, services, public facilities and accommodations. Nowhere in the Act do we find authority to order the payment of damages for pain, suffering, and humiliation. We can find no statutory authority for payment of punitive damages. There are provisions for criminal penalties for certain unlawful practices, such as may be found in K.S.A. 44-1013, 44-1016, 44-1027, and 44-1041. These criminal penalties are limited as to dollar amount, or such violations are punished as misdemeanors.

K.S.A. 44-1042 has been mentioned as a source of authority for awarding compensatory damages for pain, suffering, and humiliation. This section of the statute does not purport to authorize the KCCR to award any type of damages. It does refer to and require a reduction from the amount of any compensation awarded the

complainant. Credit must be given for compensation previously received by complainant until the time such order is entered. K.S.A. 44-1005 does authorize the KCCR to enter an award for back pay to correct acts of discrimination in firing and in the amount of pay received by a complainant. Such an award for back pay is for compensatory damages. It compensates the complainant for wages he or she should have received. K.S.A. 44-1042 cannot be read to authorize compensatory damages for pain, suffering, and humiliation. It merely provides for a reduction in the amount of any award allowed for wages so that the proper amount of wages is received and prior wages received will be taken into consideration. See similar provision for interim earnings in the Federal Civil Rights Act, 42 U.S.C. 2000e-5 (g).

Next it is suggested that an allowance for pain, suffering, and humiliation has been authorized by the KCCR in administrative regulation K.A.R. 21-45-21. It is true this regulation provides that an order of the examiner and the KCCR may include:

"(3) Compensation damages: Awarding of compensatory damages to the persons aggrieved by such practice, as will effectuate the purposes of the law; and

"(4) Punitive damages: Awarding of punitive damages to the persons aggrieved by such practice, as will effectuate the purposes of the law."

However, the Commission cannot pull itself up by its own boot straps. The power to adopt rules and regulations is administrative in nature, not legislative, and to be valid must be within the authority conferred. An administrative rule or regulation which goes beyond that which the legislature has authorized, or which violates the statute, or which alters, extends, or limits the source of its legislative powers is void. *State, ex rel., v. Columbia Pictures Corporation,* 197 Kan. 448, Syl. ¶ 4, 417 P.2d 255 (1966); *Willcott v. Murphy,* 204 Kan. 640, 465 P.2d 959 (1970); *Rhodes v. Harder,* 211 Kan. 820, Syl. ¶ 3, 508 P.2d 959 (1973); *Country Club Home, Inc. v. Harder,* 228 Kan. 756, Syl. ¶ 8, 620 P.2d 1140 (1980).

It is apparent after reading the authorizing statutes K.S.A. 44-1004 and 44-1005 that K.A.R. 21-45-21 adopted by rule goes far beyond any authority in the statutes and inasmuch as it does exceed statutory authority that portion of such rule or regulation is void.

Appellee asserts that *Hutchinson Human Relations Comm. v. Midland Credit Management, Inc.,* 213 Kan. 308, 517 P.2d 158

(1973), recognizes that recovery of damages may be proper. That case was one brought for specific performance of a "conciliation agreement" entered into and signed by the employer. No question was raised concerning the authority of the parties to enter into the agreement, and the action for specific performance of the agreement was originally brought in the district court which was exercising its judicial powers to require specific performance of a contract. It was not an appeal case reviewing a KCCR order. The case is not persuasive, for the only damages suggested were those which can be assessed by a district court in lieu of specific performance of a contract.

The appellee cites various cases from other states, which cases authorize awards of damages in administrative proceedings where acts of unlawful discrimination have been found. One such case cited is *Bournewood Hosp., Inc. v. Mass. Comm'n Against Discrimination,* 371 Mass. 303, 358 N.E.2d 235 (1976). The authority of the Massachusetts commission is set out in Mass. Ann. Laws ch. 151B, § 4 (Michie/Law. Co-op. 1976) and includes specific authority to award "damages" not to exceed one thousand dollars on each violation. Two violations were found by the commission in the above case and its award was affirmed by the court; so the award of $2,000.00 in damages was specifically authorized by statute. Such an award amounts to a civil penalty, and should not be confused with a general unlimited award for pain and suffering.

We note there are cases from other states which hold on the basis of their respective statutes an award of damages for pain and suffering is proper. However, limited authority has been exercised when it comes to the allowance of awards for pain and suffering. Most awards which have been approved do not exceed $1,000.00, and none even approach the amount allowed for pain, suffering, and humiliation in our present case.

It has been suggested that this court has determined that the Workmen's Compensation Director, an administrative officer, performs functions which are essentially judicial by making awards for physical disabilities. See *Gawith v. Gage's Plumbing & Heating Co., Inc.,* 206 Kan. 169, 476 P.2d 966 (1970). Again, one must consider the statute which authorizes and empowers the agency or administrative officer to act. It is immediately apparent on reading the workmen's compensation statutes that there is no

shortage of statutory direction and authority to make dollar awards based upon bodily disabilities. Upon determination of specific bodily disabilities the workmen's compensation statute provides for the exact method of arriving at the amount of the statutory awards for both scheduled and nonscheduled injuries. See K.S.A. 44-510, 44-510a, 44-510b, 44-510c, 44-510d, 44-510e, 44-510f, and 44-510g. The agency was granted the specific statutory authority to make awards for bodily disabilities based upon and limited by statutory formulae. These workmen's compensation statutes do not authorize the agency or the director to award damages for pain and suffering. No award for such has ever been attempted under the workmen's compensation statutes, and any attempt by the director to award damages for pain and suffering would be unauthorized by statute.

An action to recover damages for pain, suffering, and humiliation is in the nature of a suit at common law. 1 Am. Jur. 2d, Administrative Law § 153, p. 959. Such actions are legal actions. In *Equal Employment Op. Com'n v. Detroit Edison Co.,* 515 F.2d 301, 308 (6th Cir. 1975), Judge Lively states:

"Back pay in Title VII cases is considered a form of restitution, not an award of damages. Since restitution is an equitable remedy a jury is not required for the award of back pay. Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969). Damages are a legal, not an equitable remedy, and the Seventh Amendment requires a jury trial in a statutory action 'if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law.' Curtis v. Loether, 415 U.S. 189, 194, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974)."

The Seventh Amendment to the United States Constitution states:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." See also Kan. Const. Bill of Rights, § 5.

There is no provision for a jury in the proceedings before the KCCR. It has been suggested that the judicial review in the district court, provided by K.S.A. 44-1011, is sufficient to comply with the constitutional requirements. This statute authorizes the commission to secure enforcement of its final orders by resort to the district court. The statute also provides for review as follows:

"The court shall hear the appeal by trial *de novo* with or without a jury in accordance with the provisions of K.S.A. 60-238, and the court may, in its

discretion, permit any party or the commission to submit additional evidence on any issue. Said appeal shall be heard and determined by the court as expeditiously as possible. After hearing, the court may affirm the adjudication. If the adjudication by the commission is not affirmed, the court may set aside or modify it, in whole or in part, or may remand the proceedings to the commission for further disposition in accordance with the·order of the court."

The jurisdiction and authority of the district court on review can be no greater than the authority of the KCCR even if the matter is heard on appeal in the nature of a trial de novo. The statute provides that the court shall hear the appeal with or without a jury and the court, in its discretion, may permit additional evidence on any issue. As the statute reads, neither party has an absolute right to introduce additional evidence. "The review shall be heard on the record without requirement of printing." Under these circumstances review in the district court can hardly cure a lack of due process before the agency. The provision for a jury in K.S.A. 44-1011 is tied to the provisions of K.S.A. 60-238. The latter statute provides:

"(a) *Right preserved.* The right of trial by jury as declared by section 5 of the bill of rights in the Kansas constitution, and as given by a statute of the state shall be preserved to the parties inviolate.

"(b) *Demand. Any party may demand* a trial by jury of any issue triable of right by *a jury* by serving upon the other parties a *demand therefor in writing* at any time after the commencement of the action and *not later than ten (10) days after the service of the last pleading directed to such issue.* Such demand may be indorsed upon a pleading of the party." Emphasis supplied.

As appears in this statute, the right of trial by jury is dependent upon filing a demand "not later than ten (10) days after the service of the last pleading directed to such issue." In a proceeding before the KCCR, a verified complaint must be filed with the Commission (K.S.A. 44-1005), and it is only after failure to arrive at a conciliation agreement that the respondent is required to answer the charges. A request for trial by jury before the KCCR would be futile for there is no provision for such in the hearings before that agency. On appeal to the district court under K.S.A. 44-1011 the person aggrieved files "a written appeal praying that such order be modified or set aside." This is filed with the clerk of the district court and a copy is sent to the KCCR. Thereupon the record made before the KCCR is forwarded to the district court. No additional pleadings are provided for and it is not clear when a request for jury should be filed. It appears clear from the statute

that trial by jury would be at the discretion of the district judge, and the record made before the KCCR would be read to the jury.

It seems apparent from the statutes that neither the proceedings before the KCCR nor the appeal proceedings before the district court contemplate a truly evidentiary jury trial. Review proceedings on the record supplemented with additional evidence would not appear to be an evidentiary jury trial under constitutional guidelines.

The enforcement provisions of the Kansas Act Against Discrimination to recover back pay are initially in the hands of the KCCR. The proceedings are no different than those before many other agencies. Enforcement under the anti-discrimination law is similar in nature to enforcement of the Wage Payment Act, K.S.A. 44-313 *et seq.*, by the secretary of the Department of Human Resources. Under that Act the payment of Wages on termination of employment are mandated and the secretary is authorized to hold hearings and order payment of wages plus damages as specified in K.S.A. 44-315. The damages are set and they amount to one percent of the unpaid wage for each day "upon which such failure continues." The secretary may apply to the district court to enforce the orders of that agency. Appeals to the district court, similar to appeals from an order of the KCCR, are provided for in K.S.A. 44-322a. In this and other similar statutes authorizing an administrative agency to assess damages as penalties, the damages or penalties, without exception, are limited by the authorizing statute. No agency in Kansas has been authorized by statute to award unlimited amounts for pain and suffering.

The Tenth Circuit Court of Appeals in an analogous case has construed the federal anti-discrimination act not to authorize punitive damages. *Pearson v. Western Elec. Co., Etc.,* 542 F.2d 1150 (10th Cir. 1976). In *Pearson* the employee was discharged from employment as in the present case and under Title VII of the Civil Rights Act it was said:

" 'If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice . . . the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other *equitable relief* as the court deems appropriate' (Emphasis supplied). The back pay award

provided as relief in Title VII is not punitive in nature but equitable, intended to restore the recipients to their rightful economic status. [Citations omitted.]" 542 F.2d at 1151-52. Emphasis supplied.

The court in *Pearson* pointed out that the award of punitive damages is a legal rather than an equitable remedy and accordingly, punitive damages should not be allowed. The wording of the federal act, almost identical to that of K.S.A. 44-1005, indicated to that court that Title VII was not enacted to seek punishment of the responsible party, but rather to compensate the victim of discrimination for back pay and to restore his civil rights. Awarding damages for pain and suffering in discrimination cases is in truth nothing more than assessing punitive damages, for there are no physical injuries out of which pain and suffering arise.

Other states with anti-discrimination statutes similar to ours have refused to extend the authority of their administrative agencies to permit allowance of damages for pain, suffering, or humiliation. See *Iron Workers Local No. 67 v. Hart,* 191 N.W.2d 758 (Iowa 1971); *Gutwein v. Easton Publishing Co.,* 272 Md. 563, 325 A.2d 740 (1974); *Mendota Apts. v. District of Columbia Com'n on H.R.,* 315 A.2d 832 (D.C. App. 1974); *Ohio Civil Rights Comm. v. Lysyj,* 38 Ohio St. 2d 217, 313 N.E.2d 3 (1974); *Pa. Human Relations Comm. v. Feeser,* 29 Pa. Commw. Ct. 437, 371 A.2d 549 (1977); *Indiana Civil Rights Com'n v. Holman,* _____ Ind. App. _____, 380 N.E.2d 1281 (1978); *Pa. Human Rel. Com'n v. Zamantakis,* 478 Pa. 454, 387 A.2d 70 (1978).

Accordingly we hold the Kansas Commission on Civil Rights is not authorized under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.,* to order an employer to pay an employee damages for pain, suffering, and humiliation arising from employer discrimination. There is no statutory authority permitting the adoption of K.A.R. 21-45-21 permitting orders of the KCCR covering compensatory and punitive damages and that portion of said regulation is void.

The judgment of the trial court is reversed and the case is remanded for a new trial on all issues.

HERD, J., concurring and dissenting: I concur with the majority that the trial court erred in its ruling on the burden of proof.

However, I dissent from the majority holding that damages for pain and suffering are improper in actions under the Kansas Acts

Against Discrimination. K.S.A. 44-1005 authorizes the commission "to take such affirmative action, *including but not limited to . . .*" the various remedies provided therein. The majority opinion defies that statute by restricting the remedies available to a victim of discrimination. It limits the remedies in spite of the specific recognition in K.S.A. 44-1042 that the commission may include "an award of compensatory damages in any final order . . ." and in spite of the legislative direction, contained in K.S.A. 44-1037, that "[t]he provisions of this act shall be construed liberally for the accomplishment of the purposes thereof." The stated purposes of the Act are the elimination of discrimination in employment and the assurance of equal opportunity for all. Since compensatory damages are authorized under the Kansas Acts Against Discrimination it follows that damages for pain and suffering may be awarded as well. Compensatory damages are defined as damages in satisfaction of, or in recompense for loss or injury sustained. The term covers all loss recoverable as a matter of right and includes all damages other than punitive or exemplary damages. 22 Am. Jur. 2d, Damages § 11, pp. 26-27. See also *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 401, 507 P.2d 189 (1973). Damages for pain and suffering are merely a species of damages awarded for a particular type of injury. Without question the term compensatory damages includes damages for pain and suffering.

I take particular umbrage at the majority's statement: "Awarding damages for pain and suffering in discrimination cases is in truth nothing more than assessing punitive damages, for there are no physical injuries out of which pain and suffering arise." This is a clear misconception of the nature of damages for pain and suffering, implying they must arise out of physical trauma. Not so. 25 C.J.S., Damages § 63 states:

"Mental pain and suffering in connection with a wrong which, apart from such pain and suffering, constitutes a cause of action is a proper element of damages where it is the natural and proximate consequence of the wrong.

"Where an allowance is made for mental pain and suffering, it is an element of actual or compensatory, as distinguished from exemplary or punitive, damages; the award is made as a matter of right and not of discretion, and the grounds for an allowance of exemplary damages need not be present." pp. 815-16.

Damages for mental pain and suffering are neither the derivative of physical trauma nor the equivalent of punitive damages. Instead they are a form of compensatory damages which focus on

the victim. Punitive damages, on the other hand, are given as an enhancement of compensatory damages to punish the defendant. Clearly the Kansas Commission on Civil Rights has statutory authority to award damages for mental pain and suffering where justified by the evidence.

The most unfortunate consequence of the majority's refusal to follow the legislative mandate of K.S.A. 44-1037 coupled with its reaching out to give an advisory opinion on damages after the case is disposed of on burden of proof is the negative impression created which will be interpreted as this court retreating from its commitment to civil rights. Such an interpretation is understandable in light of the spotted history of civil rights in this country and the constant gap between promise and performance. At times the pendulum has swung toward the fulfillment of that promise; most often, however, it has turned the other way. Following 200 years of slavery and its devastating effect on both slave and free man, the Civil War was fought, resulting in the Emancipation Proclamation and the 13th, 14th and 15th Amendments to the U.S. Constitution. Those amendments transformed the concept of equal justice into a constitutional right and authorized Congress to enact appropriate legislation to give effect to the newly recognized rights. These amendments constituted the first changes in the Constitution in over sixty years. They were followed by the Civil Rights Act of 1866, the Anti-Peonage Act (1867), the Enforcement Act of 1870, the Force Act of 1871, the Ku Klux Act (1871), and the Civil Rights Act of 1875. These were the so-called Reconstruction Statutes which were intended to insure to the Negro all the civil rights possessed by other citizens. The pendulum had swung far toward the black man. Imagine his joy and exaltation on being miraculously transformed from a propertyless, illiterate chattel into a free man with all the rights of a citizen. His expectations were lifted to the heights only to be summarily dashed by reality in a short period of time.

The post-war amendments and civil rights legislation failed to meet their promise of securing equality for the Negro. In the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), the Supreme Court effectively read the privileges and immunities clause out of the 14th Amendment. According to the *Slaughter-House* court, the privileges and immunities clause did not transform the rights of citizens of each state into rights of

national citizenship enforceable as such in the federal courts. Instead, it only protected against state encroachment those rights "which owe their existence to the federal government, its National character, its Constitution, or its laws." p. 79. The rights protected, the court said, were solely those which would not have existed but for the presence of the federal government. Rights which did not owe their existence to the federal government were privileges and immunities only of state citizenship. The right to earn a livelihood was such a right and was thus not protected by the 14th Amendment. In spite of the constitutional amendments and the implementing statutes, the Court had restored states' rights.

The Civil Rights Act of 1875 was the most important of the Reconstruction statutes designed to insure equal rights for blacks. It climaxed a decade of congressional efforts to elevate the ideal of racial equality to the legal place, prohibiting discrimination in public accommodations and jury duty. It did not take long, however, for the courts to gut the act. In the *Civil Rights Cases,* 109 U.S. 3, 27 L.Ed. 835, 3 S.Ct. 18 (1883), the Supreme Court ruled the prohibition unconstitutional, holding that the enforcement section of the 14th Amendment was limited to "state action" and that Congress could not reach private discriminatory action. Under this decision and that of *Slaughter-House,* the reach of the 14th Amendment was significantly limited. Civil rights were left to the states for protection. Expectations of black citizens were step-by-step being dashed.

Next came *Plessy v. Ferguson,* 163 U.S. 537, 41 L.Ed. 256, 16 S.Ct. 1138 (1896). This case grew out of a Louisiana statute requiring separate accommodations for blacks and whites on trains. In spite of the obviously discriminatory intent, the Supreme Court upheld the law. Under the 14th Amendment, the court stated, "separate but equal" facilities were sufficient. The post-war amendments and statutes were now virtually obliterated. Discrimination was rampant. Segregation became worse than during slavery. The states passed voter qualification statutes which successfully eliminated the black man's vote. He had no power. He had no hope for economic betterment. His schools were inferior. He was truly an "invisible man."

This condition existed until 1954 when the Supreme Court

declared in *Brown v. Board of Education*, 347 U.S. 483, 98 L.Ed. 873, 74 S.Ct. 686 (1954):

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.' " p. 494.

## Richard Kluger in *Simple Justice* (1976), says of *Brown:*

"It was not only how many people the decision affected that mattered; it was the way it affected them—inside. Having proclaimed the equality of all men in the preamble to the Declaration of Independence, the nation's founders had then elected, out of deference to the slaveholding South, to omit that definition of equalitarian democracy from the Constitution. It took a terrible civil war to correct that omission. But the Civil War amendments were soon drained of their original intention to lift the black man to meaningful membership in American society. The Court itself would do much to assist in that process, and *Plessy* was its most brutal blow. Congress passed no civil-rights laws after the Court-eviscerated one of 1875, and those that remained on the books were largely ignored by the states and unenforced by federal administrations that ranged in their attitudes from the racism of the Wilson regime to the largely ineffectual friendship of the Truman presidency. Since the expedient demolition of Reconstruction, white America had lost enthusiasm for the ennobling language of equalitarianism. The Negro, technically liberated from bondage, was expected to shift on his own. But he was no more welcomed in the North and the West than he was embraced in the South, which derived a perverse solace for its own troubled fortunes by kicking around his black hide. Denied high skills or advanced learning, he remained a superfluous and lower order of American being, excess baggage in the nation's rush to prosperity and greatness. At most, he was there to keep the American dream brightly polished and fetch cool libations for its white beneficiaries. The law, as interpreted by the Supreme Court, had pronounced it permissible—indeed, it was normal and expected—to degrade black America.

"It was into this moral void that the Supreme Court under Earl Warren now stepped. Its opinion in *Brown v. Board of Education,* for all its economy, represented nothing short of a reconsecration of American ideals. At a moment when the country had just begun to sense the magnitude of its global ideological contest with Communist authoritarianism and was quick to measure its own worth in terms of megaton power, the opinion of the Court said that the United States still stood for something more than material abundance, still moved to an inner spirit, however deeply it had been submerged by fear and envy and mindless hate. 'What the Justices have done,' editorialized the Cincinnati *Enquirer,* 'is simply to act as the conscience of the American nation.' The Court had restored to the American people a measure of the humanity that had been drained away in their climb to worldwide supremacy. The Court said, without using the words, that that ascent had been made over the backs of black America—and that when you stepped on a black man, he hurt. The time had come to stop.

"The reaction within the black community was muted. There was no dancing on the tables in Harlem. Race leaders such as Ralph Bunche were pleased but cautious in their comments. Commendatory editorials appeared throughout the black press, to be sure, along with calls for prayers of thanksgiving, but the mood of overall wariness in colored America was suggested by the *Courier's* columnist Nat D. Williams, writing out of Beale Street in Memphis. 'There was no general "hallelujah, 'tis done," hullabaloo on Beale Street over the Supreme Court's admission that segregation in the public schools is wrong,' wrote Williams. 'Beale Streeters are sorta skeptical about giving out with cheers yet.' Too many proclamations of white America's good intentions had reached black America's ears in the past to permit premature celebration now. There was added hesitation, no doubt, in expressing open glee lest it be taken as a sign of gratitude and thereby provide whites the emotional satisfaction over a deed well done. For, upon analysis, all the Supreme Court had truly and at long last granted to the black man was simple justice." pp. 709-10.

The pendulum had again begun to swing. The 1957 Civil Rights Act passed, followed by the 1964 Act and its 1972 amendments, the Voting Rights Act of 1965 and Civil Rights Act of 1968. The states followed suit with Civil Rights Acts of their own. Kansas was truly a leader in this area, passing the original version of the K.A.A.D. in 1953. Black people began to register to vote and to exercise some political muscle. No sooner had conditions improved, however, than efforts began in an attempt to dilute those hard earned gains. The Southern Manifesto and the so-called "freedom of choice" plans were immediate responses. But the resistance continues today in a more subtle manner. For example, the private school movement and the anti-busing crusade are in large part racially motivated. Those opposed to busing as a tool to achieve public school desegregation were not nearly so vocal when buses were used to insure segregation.

The government policy previously discussed offers a promise of equal opportunity in education, employment and public accommodations. There are still those, however, who would forestall the implementation of this promise. Blacks and other minorities are aware of that threat. They understand the code words for discrimination such as "states' rights," "neighborhood school," "local control" and are apprehensive.

It is not the purpose of this dissent to question the good intentions or motives of the majority; the purpose is to point out its opinion will be interpreted as a weakening of judicial resolve on civil rights, a resolve upon which blacks are dependent. Judicial action has historically set racial policy. *Dred Scott v.*

*Sandford,* 60 U.S. (19 Howard) 393, 15 L.Ed. 691 (1857), was instrumental in triggering the Civil War by removing all hope of citizenship for Black persons. Then came *Slaughter-House, Civil Rights Cases* and *Plessy,* successfully destroying the post-war amendments and statutes resulting in rampant prejudice fully countenanced by the courts. Finally, in *Brown* the court recognized the constitutional guarantees as a commitment to human rights. It marked a turning point in America's willingness to face the consequences of centuries of racial discrimination. The public attitude began to change. Civil rights legislation followed. Conditions improved, but continued improvement in racial relations is dependent upon the leadership of the judiciary. Since a majority in this country is white and inclined toward race prejudice, the executive and legislative branches of government are prone to reflect the demands of their constituency. Fair treatment for minorities is dependent upon the Constitution. The judiciary as guardian of the Constitution is the last refuge of the oppressed. To prevent this court's action from being interpreted as prejudicial I would follow the statute and permit an award of damages for pain and suffering under the Kansas Acts Against Discrimination.