No. 56,355

WILLIAM C. WOODS, *Appellee*, v. MIDWEST CONVEYOR COMPANY, INC., *et al.*, *Appellants*.

(697 P.2d 52)

Opinion filed March 2, 1985.

*Robert B. Terry*, of Spencer, Fane, Britt & Browne, of Kansas City, Missouri, argued the cause, and *Michael F. Delaney*, of the same firm, and *John Bukaty, Jr.*, of Bukaty & Bukaty, of Kansas City, were with him on the briefs for appellant Midwest Conveyor Company, Inc.

*Brandon L. Myers*, of Kansas Commission on Civil Rights, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is an appeal from the second trial of a racial

discrimination action filed by William C. Woods. Appellant Midwest Conveyor Company, Inc., appeals the district court decision which held appellee Woods' termination was discriminatory.

Appellee Woods filed his complaint against Midwest Conveyor Company, Inc. with the Kansas Commission on Civil Rights in September, 1977. The complaint alleged the termination of appellee's employment with Midwest Conveyor constituted racial discrimination.

Appellee, who is a black male, was originally employed by appellant as an entry level laborer. He received job training and was promoted twice. At the end of three years he held the position of painter, second class. During a work force reduction, appellee was "bumped" by a senior employee from his painter position to production operator.

Appellant maintained an absence control policy under which points were assessed for absences from work. Under this policy, appellee was disciplined several times. However, it was found that white employees were not held to the absence control policy and absences from work and tardiness of whites were overlooked by the supervisors. It was the application of this absence control policy, which had been incorrectly calculated, which led to appellee's termination.

The Kansas Commission on Civil Rights and the district court both found appellee was subjected to a pattern of racial discrimination over an extended period of time by appellant. The discrimination was held to have been the cause of appellee's termination. Appellee was awarded back wages and compensatory damages for pain, suffering and humiliation.

Midwest appealed to this court. We reversed and remanded the case for a new trial holding the trial court utilized an improper burden of proof and improperly awarded damages for pain and suffering. *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 648 P.2d 234 (1982) (*Woods I*). Upon retrial judgment was entered in favor of Woods for back wages and interest, totalling $62,499.04 and reinstatement. Midwest again appeals.

This court's first consideration is the proper scope of appellate review. In *City of Council Grove v. Ossmann*, 219 Kan. 120, Syl. ¶ 1, 546 P.2d 1399 (1976), we held:

"Where the trial court has made findings of fact and conclusions of law, the

function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law."

Further, the findings adopted by the trial court will not be set aside unless they are clearly erroneous. 219 Kan. at 126.

Midwest concedes the rule set forth in *City of Council Grove v. Ossmann* is the general standard but contends a different standard should apply in cases such as this where no "live" testimony was introduced. A similar argument was presented to the Kansas Court of Appeals in *Webb v. City of Leavenworth*, 8 Kan. App. 2d 525, 661 P.2d 1 (1983), and rejected. Further, K.S.A. 44-1011 states that in appeals from KCCR orders:

"The jurisdiction of the district court of the proper county as aforesaid shall be exclusive and its final order or decree shall be subject to review in the same manner as other appeals from the district court in civil cases."

We conclude, therefore, the general rule relative to appellate review applies in this case. Thus, where the trial court has made findings of fact and conclusions of law in a trial de novo arising from a Kansas Commission on Civil Rights proceeding, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law.

The first time this case was before this court, one of the issues concerned the applicable burden of proof. In *Woods I* we held:

"The burden of proof in a proceeding under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.*, is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination. Then the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for respondent's conduct. Once the respondent discharges this obligation, the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination." Syl. ¶ 2.

Disputed evidence was presented on whether Woods and other black employees had been discriminated against in various matters including tardiness, absenteeism, and selling goods on the job to other employees. The trial court found evidence of discrimination and concluded Woods had met his burden of presenting a prima facie case his termination was discriminatory.

Under the proper scope of review previously discussed, our role on appeal is to determine whether there is substantial competent evidence to support the findings of discriminatory conduct and the conclusion the requisite prima facie case had been presented. We have reviewed the record and hold there is sufficient competent evidence to support the trial court's determination that Woods had met his burden of presenting a prima facie case of discriminatory termination.

As stated in *Woods I*, the burden of going foward with the evidence then shifted to Midwest, which may discharge the burden "by evidence of a legitimate, nondiscriminatory reason" for Woods' termination. Appellant claimed Woods' threatening conduct, as well as his use of abusive language towards his supervisors, resulted in his termination. The KCCR and the trial court both found appellant's reasons offered for Woods' termination were not legitimate, nondiscriminatory reasons. We must determine if this finding is supported by substantial competent evidence.

Let us review the facts from William C. Woods' point of view, since he was the prevailing party below. That is the proper perspective when examining a record for substantial competent evidence to support a trial court's findings.

Woods had vacation time coming. He followed company procedure and notified the office of the days he would be gone. He stated he would be gone from August 3 to August 10. He concluded this was "five days." An official of Midwest noticed Woods' proposed vacation dates encompassed six days, rather than five. The official unilaterally decided to mark through the number 10 and made it a 9, unknown to Woods. Woods returned to work on the 11th, as he had indicated. He was called to the office and advised that his late return caused the company to fire him. This injustice, coupled with the long history of racial discrimination, angered Woods.

A meeting was held in a small office on the premises. Woods was surrounded by four white senior employees whom he considered antagonistic towards him. He tried to show them the company had made a mistake. None would listen. Woods shouted and used profanity but was still ignored. The company personnel manager, Mr. Joslin, who was one of the four white men, started to walk away and leave the scene. Woods shouted

that Joslin could not leave the room until he had shown him the mistake. Joslin proceeded out. Woods placed his hand on Joslin in a restraining manner and moved between Joslin and the door. At the same time, Woods removed a ten-inch crescent wrench from his overalls. He waved it in the air and banged it on the table to get everyone's attention. Joslin stated he was going to call the police. Woods placed his hand on the telephone, preventing the call. Finally, Woods had the men's attention. They called in a mediator and reluctantly concluded Woods' claim was correct. He had not returned late and his termination was therefore unlawful. In spite of the mistake, management was determined to fire Woods. It was then decided to fire Woods for getting angry at management for trying to fire him without just cause. It was suggested he should have gone quietly and filed a grievance. Such action sounds rational, but it was an impractical solution to William Woods' problem. He had previously filed grievances from which nothing transpired. He had been subjected to a pattern of racial discrimination for a long period of time at Midwest. He had been unjustly accused of overstaying his vacation. No one would listen to his side of the dispute. He considered this a mere continuation of the racial discrimination. He protested in righteous indignation, demanding that management listen to his side of the story. He proved he was correct. He testified his waving the wrench and placing a restraining hand on Mr. Joslin were not threatening gestures, but merely an effort to be heard. His testimony was corroborated by John A. Sanders and the circumstances of the meeting. The Civil Rights Commission examiner, who heard the testimony, believed William Woods, as did the trial court.

After Woods discharged his burden of proof by introducing evidence of Midwest's discrimination, Midwest testified Woods was fired because of his restraining Joslin, brandishing a wrench and using abusive language. It claims this is a nondiscriminatory reason for Woods' termination. The Civil Rights Commission and the trial court found Midwest's reason for firing Woods to be a subterfuge and William Woods had sustained his burden of proof that he was fired as a result of racial discrimination. We are bound by that finding of fact if it is supported by substantial competent evidence. We conclude it is so supported. Now let us turn to the question of damages. An employee improperly dis-

charged because of discrimination is entitled to receive the back pay including raises he would have received but for the illegal termination, less wages earned in mitigation. See 2 Larson on Employment Discrimination §§ 55.23 and 55.37 (1982).

The trial court made the following determination on this issue:

"30. The Complainant suffered loss of wages as a direct and proximate result of the discriminatory acts of Respondent and is entitled to an award for loss of wages in the amount of $62,499.04, job reinstatement, interest from the date of the order herein and an order to Respondent directing Respondent to cease and desist unlawful discriminatory practices.

"31. The record herein does clearly reflect the rate of pay the Complainant was receiving and what he would have received but for the discriminatory conduct of the Respondent. Complainant met his duty to mitigate his damages by reasonably and continually seeking and accepting comparable work and benefits. Complainant would have been entitled to $5.90 per hour for a forty (40) hour week or $236.00 per week from the week of August 15, 1977. On May 27, 1978, the Complainant would have moved to the next wage scale by reason of the fact that he would have been in Respondent's employ for two (2) years. The new wage scale would have been $6.25 per hour plus a night differential of $.20 per hour or $6.45 per hour or $258.00 for a forty (40) hour week. As of May 27, 1979, he would have moved to a pay rate of $7.00 per hour plus $.20 per hour night differential or $7.20 per hour or $288.00 per week up to the time of the public hearing. The above pay rate basis is computed as follows:

|  |  |
|---|---|
| $ 236.00 | Per Week |
| x 41 | Weeks from August 15, 1977 thru May 26, 1978 |
| $ 9,676.00 | |
| | |
| $ 258.00 | Per Week |
| x 52 | Weeks from May 29, 1978, thru May 25, 1979 |
| $13,416.00 | |
| | |
| $ 288.00 | Per Week |
| x 34 | Weeks from May 28, 1979 to January 19, 1980 |
| $ 9,792.00 | |
| | |
| $ 9,676.00 | |
| 13,416.00 | |
| 9,792.00 | |
| $32,884.00 | Total Complainant would have earned to date of original KCCR public hearing. |

Interim earnings of Complainant to date of original KCCR public hearing were as follows:

*Unemployment Compensation:*

| | |
|---|---|
| $ 77.00 | Weekly Benefit |
| x   20 | Weeks from November 9, 1977, to March 17, |
| $ 1,540.00 | 1978 |
| 29.99 | Weekly Benefit for Week ending March 24, 1978 |
| $ 1,569.00 | Total Unemployment Compensation |

*Economic Opportunity Foundation, Inc. (Kansas City, Kansas)*

| | |
|---|---|
| $ 5,466.10 | For Year, 1978 |
| 2,148.00 | For January, February & March, 1979 @$716 per month |
| $ 7,614.10 | |

"It must be noted at this point that the duty to mitigate one's damages when wrongfully discharged demands only reasonable efforts in that regard. In that case it did not require Complainant to maintain his employment with Kansas City, Kansas in 1979, when he had an opportunity to gain a better paying position at another job. The Kansas City, Kansas job paid less than what he would have been earning at Respondent had Respondent not fired him. If he had a reasonable opportunity to gain employment at a rate of pay closer to that which he lost at Respondent, he had a duty to try to do so. Otherwise, Respondent would now be arguing that Complainant's failure to reasonably seek that better paying job should bar him from wage loss award. The fact that Complainant's reasonable efforts to procure a higher paying job in California failed does not bar him from damages. He did not actually have to procure the job and mitigate his damages. He just had to try, which he did. He met his duty of mitigation, proved the wage loss and is entitled to the award of the Commission and District Court of $23,700.90 to date of original Kansas Commission on Civil Rights public hearing.

*Total Earnings*

| |
|---|
| $ 1,569.00 |
| 7,614.10 |
| $ 9,183.10 |

*Total Net Wage Loss to Date of Original KCCR Public Hearing*

| |
|---|
| $32,884.10 |
| -9,183.10 |
| $23,700.90 |

"By agreement of the parties an evidentiary deposition of William Woods was taken on March 18, 1983. The purpose of the deposition was to update the situation as to wage loss, interim earnings, mitigation of damages, etc., to determine whether Mr. Woods would be entitled to an award for lost wages since the original Kansas Commission on Civil Rights hearing. Recognizing that during the long period while the case has been on appeal since the Kansas Commission

on Civil Rights hearing, Mr. Woods may have incurred more losses which were continuing up to the Kansas Commission on Civil Rights hearing according to the Kansas Commission on Civil Rights order, the Court allowed this procedure. The testimony and evidence at that deposition reveal that:

"Had Complainant not been terminated at Midwest Conveyor he would have continued working as a full time employee in that position of production operator during the period since the original Kansas Commission on Civil Rights hearing (said period after January 21, 1980, has not been addressed so far) until October 5, 1982, when he would have been laid off in a reduction of force. He would have been laid off and making no wages from Midwest Conveyor Co. from the October 5, 1982, layoff to the present date. Therefore, as a direct and proximate result of his discriminatory discharge by Respondent, Complainant lost wages from January 21, 1980, to October 5, 1982. He is entitled to have an additional award from this Court for the loss of wages which continued past the date of the Kansas Commission on Civil Rights public hearing and up to which time only the original Kansas Commission on Civil Rights order had addressed. Said amount should be offset by any wages he actually earned in that period.

"His hourly wage as of January 21, 1980 (as set out in Complainant's figures above) would have been $7.20/hour. Had Woods not been terminated, he would have made at least $7.20/hour and worked forty (40) hours per week from January 21, 1980, through October 5, 1982. If Mr. Woods had actually procured comparably-paying, full time permanent employment in that time period (or if he had refused such employment when available) perhaps his entitlement to an award for the continuing wage loss would have ceased at that point. However, he never found such comparable work. He had some temporary work in 1980 under a CETA program with Economic Opportunity Foundation at which his hourly earnings were apparently less than $3.00/hour (39 days, 8 hours/day for a total of 312 hours, gross wages $805.94 which equals $2.26/hour), some work at Perfection Motor Services at which he made about $4.17/hour (see below), and a few menial odd jobs which involved a total of $110.00 gross earnings over two years and certainly were not $7.20, or more, per hour jobs.

"As above set out, by January 21, 1980, Complainant was making $288.00 weekly gross wages. This amounts to $57.60/8-hour day or $7.20/hour.

"Looking at a 1980 calendar, it appears there were 251 week days for which Woods would have been paid either for actually working (or for which he would have had vacation or other leave if absent and would have been paid for). Two hundred fifty-one (251) days multiplied by $57.60 per day equals a loss of gross wages in 1980 of $14,457.60.

"In 1981 he would have had 261 paid weekdays/workdays. Two hundred sixty-one (261) days multiplied by $57.60/day equals a loss of gross wages in 1981 of $15,033.60.

"In 1982 up to October 5, 1982, when he would have ceased making wages due to layoff, there would have been 198 weekdays/workdays. One hundred ninety-eight (198) days multiplied by $57.60/day equals a loss of gross wages in 1982 of $11,289.60.

"Thus, his total additional loss of gross wages from January 21, 1980, to October 5, 1982, was $40,780.80.

"That figure must be offset by what he actually made in that period. He

received no interim unemployment benefits. Mr. Woods worked at Perfection Motor Services from August 28, 1982, to beyond October 5, 1982. He made $200.00/week gross wages for a 48-hour work week. That amounts to a wage rate of $4.17/hour or $33.36 day. From August 28, 1982, to October 5, 1982, there were five (5) full weeks and two (2) workdays when he earned wages. Thus, he made $1,066.72 which must offset his loss of wages. He also made $805.94 at the EOF job in 1980 which must offset. He also made $110.00 at odd jobs. Thus, his total interim compensation from January 21, 1980, to October 5, 1982, was:

|       |            |
|-------|------------|
|       | $1,066.72  |
|       | 805.94     |
|       | 110.00     |
| Total | $1,982.66  |

Therefore, Woods should be awarded an additional net wage loss from Respondent by this Court in the amount of $38,798.14 ($40,780.80 less interim earnings of $1,982.66) for the period of January 21, 1980, to October 5, 1982.

"Thus, the total award which this Court must now award Woods for loss of wages is $62,449.04 which represents a net loss of $23,700.90 to January 21, 1980 (date of Kansas Commission on Civil Rights hearing) plus the net loss from January 21, 1980, to October 5, 1982."

The record adequately supports Woods' claim for damages with proper mitigation and efforts to mitigate, stated as follows by the trial court:

"Ultimately to survive, he [Woods] was forced to seek and accept welfare, food stamps, and emergency energy assistance. (Amounts received from welfare and public assistance programs are not compensation or wages which must be considered to offset interim wage loss, so the amounts he received from such programs is irrelevant to a computation of net interim wage loss. Also, while the duty to mitigate wage loss does not require seeking welfare-type assistance, the fact is that Woods left no stone unturned in his efforts to survive his discriminatory discharge.)"

We conclude the findings of fact of the trial court are supported by substantial competent evidence and therefore will not be disturbed on appeal.

Though the author of this opinion would order reinstatement of William Woods to his position with appellant, a majority of this court believe reinstatement improper in this case because of the animosity between the parties.

The judgment of the trial court is affirmed except the appellee shall not be reinstated.

McFARLAND, J., dissenting: The majority opinion states the Kansas Commission on Civil Rights and the trial court "both found appellant's reasons offered for Woods' termination were

not legitimate, nondiscriminatory reasons," and then concludes this court's duty is to "determine if this finding is supported by substantial competent evidence." This statement is misleading. It is, however, highly significant and serves well as the focal point for beginning the discussion of how the majority, in my opinion, reached its legally incorrect result in this case.

Let us first view the statement as it relates to the KCCR. The KCCR, in its order, stated the applicable burden of proof to be as follows:

"With respect to the burden of proof, it is incumbent upon the Complainant in the first instance to establish a prima facie case and thereafter in order to rebut the prima facie showing, the Respondent is required by clear and convincing evidence to establish that its acts or conduct were justified or nondiscriminatory. If the Respondent is successful in rebutting the prima facie showing of the Complainant, the Complainant is granted the opportunity to show by competent evidence that the acts and conduct of the Respondent were a pure pretext." (Emphasis supplied.)

The KCCR then concluded:

"Based upon all the evidence and all inferences to be drawn therefrom, the Complainant has clearly established his prima facie case of discrimination on the basis of his race in violation of his rights protected under K.S.A. 44-1009(a)(1), in the terms and conditions of his employment and also the manner in which he was terminated on August 11, 1977. *Respondent has failed to show by clear and convincing evidence* that the Complainant was not discriminated against in the terms and conditions of his employment and that he was terminated for any justifiable reasons." (Emphasis supplied.)

Midwest appealed this order to the district court where it was affirmed with the trial court utilizing the same *clear and convincing evidence* burden of proof standard levied against Midwest as enunciated by the KCCR. Midwest appealed to this court. This court specifically and unequivocally rejected this standard on the burden of proof. In *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 648 P.2d 234 (1982) (*Woods I*), this court stated:

"Appellant claims it was error to require it to show by clear and convincing evidence its acts were justified or nondiscriminatory. It cites *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-56, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981), a case dealing with Title VII of the Federal Civil Rights Act, 42 U.S.C. 200e *et seq.* In the opinion Justice Powell wrote for a unanimous court:

" 'In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case

alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*, at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.*, at 804.

   ' " 'The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. See *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2 (1978); *id.*, at 29 (Stevens J., dissenting) . . . .

   " 'The burden of establishing a prima facie case of disparate treatment is not onerous. . . . The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. See *Teamsters v. United States*, 431 U.S. 324, 358, and n. 44 (1977). . . . Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

   " 'The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See *Sweeney, supra*, at 25. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

   " 'The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she had been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See *McDonnell Douglas*, 411 U.S. at 804-805.'

"We note the federal court was careful in *Burdine* to point out that the ultimate burden of persuading the trier of fact that the respondent intentionally discriminated against the complainant remains at all times with the complainant. The burden of proof never shifts to the respondent. It is the burden of going forward with the evidence that is placed on defendant after plaintiff has established a prima facie case.

"Federal court decisions concerning Title VII are not controlling on this court. *Harder v. Kansas Comm'n on Civil Rights*, 225 Kan. 556, 559, 592 P.2d 456 (1979). They are persuasive authority, however. *McCabe v. Board of Johnson County Comm'rs*, 5 Kan. App.2d 232, 235, 615 P.2d 780 (1980). Especially is this true when they concern general law in the field of civil rights. We accept and embrace the rules stated in *Burdine* as to burden of proof, prima facie case and burden of going forward with the evidence in discrimination cases.

"The burden of proof in a proceeding under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.*, is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination. Then the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for respondent's conduct. Once the respondent discharges this obligation, the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination.

"The record discloses the complainant's evidence was determined by the trier of fact to establish a prima facie case of discrimination. At that point in the proceeding the burden of going forward with the evidence shifted to the respondent to introduce evidence of some legitimate, nondiscriminatory reason for respondent's conduct. We do not reach the question of whether respondent met this burden. To give evidence of some legitimate, nondiscriminatory reason for conduct does not require proof by clear and convincing evidence. The trier of fact erred in imposing such a burden of proof on the respondent." 231 Kan. at 766 - 68.

The court in *Woods I* then reversed the trial court and remanded the case for a new trial on all issues. It is important to note that on remand the case returned to the *district court* for retrial and application of the proper burden of proof. The case was never returned to the KCCR and, hence, that agency has *never* applied the proper burden of proof to the facts. Yet, the majority states this court's duty is to determine if the findings of the KCCR and the trial court relative to Midwest's reasons for Woods' discharge are supported by substantial competent evidence. The application of the erroneous burden of proof in this crucial area totally nullifies the KCCR's findings relative to the reasons for Woods' termination.

Let us, then, look at the trial court's findings relative to the reasons for Woods' termination. Specifically, the trial court found

the reasons enunciated by Midwest for Woods' termination lacked "credence" and were shown by a preponderance of the evidence to be "merely pretexts" for discriminatory treatment.

"Credence," as defined by Webster's Dictionary, New Twentieth Century Edition 405 (1953), is:

"Belief: credit: reliance of the mind on evidence of facts derived from other sources than personal knowledge: as we give credence to a story related by a man of known veracity."

The use of the term "credence" by the trial court is interesting. Does the court mean it does not believe the reasons stated by Midwest? The reason for discharge is contained in the August 12, 1977, memo to Woods by Thomas L. Joslin. This is set forth in full as follows:

"This memo serves as notice of your discharge as an employee of Mid-West Conveyor Company. Your action, directed towards the plant Personnel Manager on August 11, 1977, is considered to have been a threat to do physical harm to him. Specifically: You stood in front of the exit door of the foreman's office, blocking Mr. Joslin's way when he stated he was leaving the office; you stated that Mr. Joslin would not leave the office; you placed your hand on Mr. Joslin's shoulder to stop him from leaving the office; you brought a wrench out of your pocket as you continued to block the exit and state[d] that Mr. Joslin would not leave; and, finally, you took the phone out of Mr. Joslin's hand when he started to call the police and you told Mr. Joslin that he would not make any call.

"Because there has been an unwillingness in the past on your part to tolerate a two-way conversation, there will be no verbal discussion of this discharge at this time. Your Union Shop Steward is available should you decide to file a grievance over this discharge. Please be advised that, should you desire to file a grievance, it must be presented in writing to the Union within two work days of the date of this discharge or you will forfeit your right to file a grievance under the terms of the Company-Union Contract.

"Any future communications between yourself and the Company or its representatives should be through your Union or other representatives.

"The Union's address & phone no. is:

Carpenters' District Council
3114 Paseo
Kansas City, Mo. 64109
Phone No. 931-3414
Business Representative: William Ruby

Signed
/s/ Thomas L. Joslin
Thomas L. Joslin
Personnel Manager."

The trial court specifically found this reason (contained in August 12 memo) lacked "credence." Yet the evidence is un-

controverted that the August 11 incident referred to occurred. Woods' own testimony relative to the incident fully corroborates the sequence of events set forth in the memorandum. Under such circumstances the trial court had no authority to find the incident did not occur or that the testimony relative thereto lacked "credence." The incident occurred—the incident was the reason enunciated by Midwest for the discharge of Woods.

Legally the question then becomes whether such conduct by Woods is a *legitimate, nondiscriminatory reason* for Woods' discharge. This is a question of law, not fact. The question must be answered affirmatively.

In *Edwards v. Foucar, Ray & Simon, Inc.*, 24 EPD ¶ 31,208 (N.D. Cal. 1980), quite similar factually to the case before us, the employee's abusive language to and threatened assault of the employee's supervisor were held to constitute a legitimate non-discriminatory reason for termination. Similar results under factual situations ranging from verbal abuse to actual personal injury were reached in the cases of *Carson v. Bolger*, 510 F.Supp. 106 (E.D. Mo. 1981); *McGraw v. General Motors Corp.*, 6 EPD ¶ 8850 (E.D. Mo. 1973); *Lazard v. Boeing Co.*, 7 EPD ¶ 9150 (D. La. 1972); and *Goodloe v. Martin Marietta*, 7 EPD ¶ 9198 (D. Colo. 1972).

My research and the briefs of the parties reveal no case in the United States where conduct such as Woods exhibited in the August 11 incident has ever been held not to be a legitimate reason for discharge. Logic and common sense dictate that severe verbal and physical assaults by an employee upon his or her supervisor constitute legitimate nondiscriminatory reasons for termination. To hold otherwise would condone deportment of this type. It is difficult to conceive of conduct more disruptive to the operation of a company's business.

The majority opinion, as previously noted, states the KCCR and the trial court "both found appellant's reasons offered for Woods' termination were not legitimate nondiscriminatory reasons" and this court's duty is to "determine if this finding is supported by substantial competent evidence." To iterate, this is a question of law, not fact. Yet in affirming the trial court, the majority opinion states:

"After Woods discharged his burden of proof by introducing evidence of Midwest's discrimination, Midwest testified Woods was fired because of his

restraining Joslin, brandishing a wrench and using abusive language. It claims this is a nondiscriminatory reason for Woods' termination. The Civil Rights Commission and the trial court found Midwest's reason for firing Woods to be a subterfuge and that William Woods had sustained his burden of proof that he was fired as a result of racial discrimination. We are bound by that finding of fact if it is supported by substantial competent evidence. Woods' testimony, though controverted, furnishes the supporting evidence.

"The rule of law demands that we abide by the rules of construction and affirm the trial court. The judgment of the trial court is affirmed."

The majority opinion, despite its earlier pronouncement relative to the finding of the KCCR and the trial court that the reason enunciated by Midwest was not a legitimate nondiscriminatory reason, bases its affirmance on the rationale that the reason enunciated was a "subterfuge." Presumably this equates to "pretext" in the burden of proof standard set forth in *Woods I*. To reach the question of "pretext," the employer must have previously stated a legitimate nondiscriminatory reason for termination. For convenience, the burden of proof set forth in *Woods I* is repeated at this point:

"The burden of proof in a proceeding under the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.*, is on the complainant to prove by a preponderance of the evidence that the respondent is guilty of a discriminatory practice. Initially, the complainant must present a prima facie case of discrimination. Then *the burden of going forward with the evidence shifts to respondent and this burden may be discharged by evidence of a legitimate, nondiscriminatory reason* for respondent's conduct. *Once the respondent discharges this obligation, the complainant must continue with the burden of proving* by a preponderance of the evidence *that the reasons offered by respondent were merely a pretext for discrimination.*" 231 Kan. 763, Syl. ¶ 2. (Emphasis supplied.)

The majority opinion states that it is utilizing the burden of proof standard of *Woods I*. Therefore, inasmuch as the majority decides the case on the basis that the reasons enunciated were a "subterfuge" (presumably equating to pretext), it must be assumed the majority concluded the reason espoused was a "legitimate, nondiscriminatory" reason. Otherwise, it could never reach the question of pretext or subterfuge. Yet this lack of specificity in the majority opinion is, by itself, illuminating. It appears the majority of this court and the trial court herein both made the same error of reasoning. Each quoted the burden of proof requirements from *Woods I*, but failed to apply the same. Neither the trial court nor the majority make any findings of fact to support the bare legal conclusion that the stated legitimate reason of Woods' discharge was merely a pretext. Indeed they

could not, as no such evidence was introduced. True, Woods testified he believed his termination was racially motivated rather than for the stated reason. However, this is not evidence sufficient to support a finding the stated reason for termination was a pretext. If it were, the *Woods I* standards on burden of proof would have little meaning. No one would file an action such as this unless he or she believed the real reason for termination was discriminatory. Again the language of *Woods I* is iterated: Once the employer shows a legitimate nondiscriminatory reason, "the complainant must continue with the burden of proving by a preponderance of the evidence that the reasons offered by respondent were merely a pretext for discrimination." As a matter of law, Woods' bare, unsupported opinion does not and cannot carry this burden. There was no evidence other employees had behaved in a comparable manner and had not been terminated. In fact, the personnel manager to whom Woods' conduct was directed testified nothing similar had ever occurred. There was no evidence that Woods was "set up" to explode in anger in order to justify termination. The evidence is all to the contrary. Woods' initial error in filing an ambiguous notice of vacation set the wheels in motion. He stated he would be on vacation August 3 - 10, 1977. Under that he wrote "5 days." If beginning and ending days were taken (August 3 and 10), Woods would be absent six days (the plant operates on a five-day week). Uncontroverted evidence was introduced most employees take 1, 2 or 3 week vacations. Some unidentified clerical person, acting on his or her own initiative, logging in the Woods' notice, noticed the inconsistency and corrected August 10 to August 9 to conform with the "5 days" stated thereon. On August 10, Woods' absence was called to management's attention by Woods' foreman. A notice of termination was prepared in accordance with the plant's union labor contract. This contract contained a disciplinary point system. Woods already had 41 disciplinary points. The five additional points for the unauthorized absence pushed him over the 45 points which required termination. Woods had, *inter alia*, been disciplined twice that same year, under the point system, for abusive language. The later incident included a warning that termination would occur upon any further such outbursts. Management did not keep the termination a secret. Woods was told by fellow employees on

August 10 he was being terminated for his absence that day (they talked to him at home). On the morning of August 11, he returned to work. Shortly thereafter his foreman asked Woods to accompany him to the personnel manager's office and advised that he was being terminated for his absence the previous day. When Woods went to the office, the personnel manager and union steward were there. Woods exploded in anger—using abusive language, physically restraining the personnel manager from leaving, and, later, from calling the police. He pulled a wrench from his overalls and waved it in what was perceived as a threatening manner. The error in the form was discovered, the termination notice was withdrawn, and Woods was told to go back to work. He was advised that some discipline would be imposed for his conduct in the office. The following day the notice of termination for the August 11 incident (previously set forth in full herein) was prepared and delivered. There simply is no evidence of conspiracy to "get" Woods or of bad faith by Midwest in handling the matter. There being no evidence the reason for termination was a pretext, then, as a matter of law, Woods has failed to meet his burden of proof.

Some comments need to be made on the issue raised relative to damages. Midwest contends the trial court misapplied the pay scale set forth in the collective bargaining agreement in computing back pay. Unfortunately, the pay scale is not included in the record on appeal and, accordingly, there is no way to determine the validity of this allegation. However, I do believe there is merit in Midwest's contention that the trial court ignored the legal significance of Woods' voluntary termination of his employment with the City of Kansas City. Woods testified he quit the job to seek higher paying work. There is no reason given why it was necessary to quit one job before seeking another. I believe that in computing damages it is proper to give Midwest credit for income Woods would have earned had he not quit his job with the municipality.

I would reverse the judgment of the district court.

SCHROEDER, C.J., and HOLMES, J., join in the foregoing dissent.